Frank David SEINFELD and Victoria
Shaev, Plaintiffs,

v.

Charles W. COKER, David A. Coulter,
Timm F. Crull, Alan T. Dickson, Kath-
leen Feldstein, Paul Fulton, Donald
E. Guinn, C. Ray Holman, W.W. John-
son, Hugh L. McColl, Jr., Walter E.
Massey, Richard M. Rosenberg, O.
Temple Sloan, Jr., Meredith Spangler,
A. Michael Spence, Ronald Townsend,
Solomon Trujillo, Jackie M. Ward,
Virgil R. Williams And Shirley
Young, Defendants.

BankAmerica Corporation,
Nominal Defendant.

Civil Action No. 16964.

Court of Chancery of Delaware.
New Castle County.

Submitted: Oct. 23, 2000.
Decided: Dec. 4, 2000.

Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, A. Arnold Gershon, P.C., New York, New York, for Plaintiffs, of counsel.

J. Travis Laster, of Richards, Layton & Finger, Wilmington, Delaware, for Individual Defendants.

Andre G. Bouchard, of Bouchard, Margules and Friedlander, Wilmington, Delaware, for Defendant BankAmerica Corporation.

### OPINION

CHANDLER, Chancellor.

Before the Court is a motion to approve a proposed settlement of this derivative lawsuit. Also pending is the application of plaintiffs' counsel for $500,000 in fees and expenses. For the reasons set forth more fully below, I approve the proposed settlement, but I award attorneys' fees and expenses in the aggregate amount of $250,000.

### I.

Frank Seinfeld and Victoria Shaev ("plaintiffs") instituted this derivative action against BankAmerica Corporation ("BankAmerica") and 19 former directors of both NationsBank Corporation and a predecessor entity of BankAmerica. The positions of these 19 directors on their respective boards were eliminated when Nations Bank and BankAmerica merged in September 1998 to form BankAmerica. This action challenged the BankAmerica directors' decision to award $300,000 in cash and BankAmerica stock to each of these 19 former directors. Plaintiffs asserted that these payments constituted corporate waste because BankAmerica was neither contractually obligated to make these payments, nor would it receive any consideration in return for them.[1] Alleging that the director defendants breached their fiduciary duties in authorizing these payments, plaintiffs sought their value, $5,7000,000, as well as other relief, including attorneys' fees.[2]

Defendants answered the complaint, denying that the payments were in any manner wrongful.[3] In addition, defendants asserted that plaintiffs failed to satisfy Chancery Rule 23.1's demand futility requirement, and that the financial remedy sought in the complaint was barred by a provision in BankAmerica's certificate of incorporation adopted pursuant to 8 Del. C. § 102(b)(7).[4]

After initial discovery, counsel quickly began negotiations, ultimately resulting in

---

1. Compl. at 3–4.

2. *Id.* at 4–5 ($5,700,000 = 19 × $300,000).

3. Answer at 4.

4. *Id.* at 5.

an agreement in principle for the resolution of the litigation. This agreement contemplated that BankAmerica's directors' and officers' liability insurance carrier would pay BankAmerica $2.5 million on behalf of the individual defendants. Counsel filed the settlement proposal with the Court on August 4, 2000, and gave notice of the pending action and proposed settlement to BankAmerica's shareholders. Twelve shareholders objected to the settlement. Some of the objectors contend the settlement is unfair because it does not require the full amount ($5.7 million) to be repaid to the Company. Other objectors complain that the only true beneficiary of this derivative action is plaintiffs' counsel—the lawyers who seek 20 percent of the settlement fund, or $500,000, in attorneys' fees. This is my decision on the motion.

## II.

■ I find that the proposed settlement of this derivative action is in the best interests of BankAmerica and its shareholders. The settlement will provide for a payment to BankAmerica of $2.5 million. That is slightly less than half of the alleged "waste" or "gift" that provoked this derivative action, but it is a fair and reasonable recovery when one considers the significant risks that would be encountered if this lawsuit were litigated to a conclusion.

If the lawsuit had not been settled, a reasonable possibility exists that the plaintiffs would recover nothing. That possibility is not insignificant considering the fact that, in order to prevail on a "waste" claim, plaintiffs would have to prove that the transaction "either served no corporate purpose or was so completely bereft of consideration that it constituted a gift."[5] Proving that there was, in effect, no benefit to BankAmerica might be a difficult proposition. Plaintiffs correctly point out that the defendants would likely have at least two responses to their "waste" claim.

First, defendants might characterize the payments as awards to former directors for prior service. Though older cases would not support such an argument,[6] more recent cases question the reasoning of these older decisions.[7] Second, defendants would likely insist that the "consideration" BankAmerica received from the payments was the continued goodwill of influential businessmen who could direct future business to the bank. This issue would give rise to a debate regarding contract law that is plainly one on which each side would have substantial arguments. Plaintiffs insist, and I agree, that "[n]either side could predict with confidence that its contentions would prevail."

As I have briefly discussed, defendants' potential arguments appear strong and pose a risk that the case, if litigated to its conclusion, would result in a complete loss for the plaintiffs. Considering that risk, as well as the costs of litigation, I believe the settlement amount is reasonable and fair, albeit modest. The objectors complain that the settlement should capture the full amount of the alleged loss ($5,700,000), but this ignores the risks and costs mentioned above, all of which operate as a discount against a full recovery. The result sought by the objectors would entail defendants complete surrender to the lawsuit, notwithstanding the availability of credible defenses. In this sense, I find the

5. *Ash v. McCall,* Del.Ch., C.A. No. 17132, Chandler, C., 2000 WL 1370341 (Sept. 15, 2000), mem. op. at 6.

6. *See, e.g., Blish v. Thompson Automatic Arms Corp.,* Del.Supr., 64 A.2d 581, 606–08 (1948).

7. *See, e.g., Zupnick v. Goizueta,* Del.Ch., 698 A.2d 384 (1997).

objectors' arguments strained and unrealistic. I approve the proposed settlement as fair and reasonable.

## III.

■ Next, I turn to the attorneys' fee request. Some of the objectors complain that the settlement rewards the attorneys more than it benefits BankAmerica and its shareholders. This Court consistently has held that, in class and derivative actions, plaintiffs' counsel are entitled to an award of attorneys' fees and expenses where their efforts achieve a benefit for the corporation or its shareholders.[8] This is an accepted principle of Delaware law, but its simplicity masks a vexing issue in our jurisprudence.

### A.

Delaware courts routinely grant fee awards in order to produce two primary incentives–the incentive for shareholders to bring meritorious lawsuits that challenge alleged wrongdoing and the incentive for plaintiffs to litigate such lawsuits efficiently. It is important for shareholders to bring derivative suits because these suits, filed after the alleged wrongdoing, operate as an *ex post* check on corporate behavior. If no incentive existed for shareholders to band together to bring these suits, they would very often not be brought. The reason is simple: for the *group* of shareholders, the benefits exceed the costs; for *individual* shareholders, the costs exceed the benefits in the vast majority of cases. When shareholder plaintiffs bring meritorious lawsuits, they deter improper behavior by similarly situated directors and managers, who want to avoid the expense of being sued and the sometimes larger reputational expense of losing in court.[9]

It is equally important, however, for plaintiffs to prosecute these lawsuits efficiently. One of the historic reasons Delaware judges have been so willing to award substantial attorneys' fees, even after a relatively quick settlement of the case, is that our fee awards are not structured to reward lawyers for needlessly prolonging litigation. Put simply, "the Court does not want to be in a position of encouraging the churning of wheels and devoting unnecessary hours to litigation in order to be able to present larger numbers to the Court."[10]

Awarding an appropriate fee should produce both of these incentives. The greater and more certain the fee, the greater the incentive for plaintiffs' lawyers to bring meritorious suits. Fee awards thus function as *ex post* judgments that will have the effect of either encouraging or discouraging future lawsuits. It will encourage them if it offers plaintiffs' lawyers the opportunity to make more money than they would make doing something else, that is, their lost opportunity cost. For most lawyers, opportunity costs are measured by their hourly rate. If the fee is large enough to cover both their lost opportunity costs and the risks associated

8. *See, e.g., Allied Artists Pictures Corp. v. Baron*, Del.Supr., 413 A.2d 876, 878 (1980).

9. Stated differently, "[b]y threatening potential defendants with no less and no more than full liability for the harms they may cause to society, private lawsuits encourage them to take optimal precautions; that is, the threat of liability creates an incentive to raise the level of care or reduce the level of potentially harmful activity to the point at which the marginal increase in the cost of prevention equals the marginal increase in the harm prevented." Note, "The Paths of Civil Litigation," 113 *Harv. L.Rev.* 1827, 1831 n. 19 (2000).

10. *In re Pullman Co. Shareholders Litig.*, Del. Ch., Consol. C.A. No. 10013, Berger, V.C. (Nov. 29, 1988), Tr. at 11–12.

with bringing the suit, as well as provide a premium, it should induce monitoring behavior. If it is not adequately large, it will encourage lawyers to select their next best opportunity, the opportunity that will be more financially promising. Similarly, the greater the fee, without regard to the number of hours invested, the greater the incentive for lawyers to settle the lawsuit efficiently. This would seem particularly true when large fee awards are granted regardless of the small number of hours spent in the litigation. Attorneys should not be encouraged to churn when they can receive a substantial premium in return for a successful result at an early stage of the litigation. It is simply not worth it to them to continue to litigate a suit because, once the suit is settled, they can pocket their premium and move to the next potential suit. The risk of losing the fee increases over time if the litigation is needlessly prolonged.

This Court has proceeded in the past on the unstated premise that awarding large fees will necessarily produce the incentives of encouraging meritorious suits and encouraging efficient litigation. But a point exists at which these incentives are produced, and anything above that point is a windfall. In other words, if a fee of $500,000 produces these incentives in a particular case, awarding $1 million is a windfall, serving no other purpose than to siphon money away from stockholders and into the hands of their agents. Thus, it is important that we attempt, in a self-conscious and transparent manner, to estimate the point at which proper incentives

are produced in a particular case. If one can at least approximate this point, one can in theory award fees in an amount that produces appropriate incentives without a significant risk of producing socially unwholesome windfalls. That point likely will be different in every case, based in large part on the difference in risks among and within cases.[11] As a result, this process is necessarily fact-specific and case-specific.

### B.

Against this framework, it is helpful to review briefly the history of attorney fee awards in Delaware. In *Goodrich v. E.F. Hutton Group, Inc.,*[12] the Supreme Court noted that "[t]he standards for awarding attorneys' fees in litigation by the Court of Chancery are well established. The starting principle is a recognition of the so-called 'American Rule.' "[13] Under the American Rule, prevailing litigants are responsible for payment of their own attorneys' fees. There are two general categories of exceptions to this rule–fee–shifting statutes and equitable doctrines. *Goodrich* involved an application of what the Supreme Court termed "the most venerable equitable exception to the American Rule: the 'common fund doctrine.' "[14] The same exception is involved here. The common fund doctrine provides that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as

---

11. By risk, I refer primarily to the risk of losing the case outright, something that every plaintiff must bear. Risk reflects the contingent nature of the work, the financing costs incurred with delaying the attorneys' compensation until the case is concluded, the inability to diversify away particular risks, as well as other contingencies.

12. Del.Supr., 681 A.2d 1039, 1043 (1996).

13. *Id.* at 1043 (citing *Tandycrafts, Inc. v. Initio Partners*, Del.Supr., 562 A.2d 1162, 1164 (1989)).

14. *Id.* at 1044.

a whole." [15]

If an attorney recovers a common fund as the result of a settlement, as is occasionally the case in both derivative and class action suits,[16] he then may independently request an award of fees from that settlement fund. That attorney now becomes both fiduciary for the client as well as claimant against the fund created for the client's benefit.[17] Because of the potential conflict between the attorney's role as both fiduciary and fund claimant, the judge's role as agent for the class or derivative plaintiff is critical. The Supreme Court has charged this Court to "make an independent determination of reasonableness on behalf of the common fund's beneficiaries, before making or approving an attorney's fee award." [18]

Beginning in 1881, fees were calculated and awarded as a reasonable percentage of the common fund.[19] Fees continued to be calculated in this manner for almost 100 years. Then, in the 1970s, courts began to use the so-called "lodestar" approach to calculate fee awards. This method requires a court to calculate "the product of an attorney's reasonable hours expended on the litigation and reasonable hourly rate," [20] adding a multiplier, if necessary, to account for factors such as the contingent nature of the case and the quality of the attorney's work.[21] The lodestar method came under attack in the 1980s for two reasons. First, the United States Supreme Court suggested in 1984 that an award in a common fund case should be based upon a percentage of the fund.[22] Second, a Third Circuit task force issued a report in 1985 concluding that all attorney fee awards in common fund cases should be structured as a percentage of the fund.[23] Ultimately, the Third Circuit allowed district court judges to exercise discretion in employing the percentage of the fund method, the lodestar method, or some combination of both, but the concerns voiced in the 1985 report, as well as in other publications, were not fully answered.[24]

The Delaware courts have often considered methods employed by other courts. For example, the *Goodrich* Court discussed the percentage of the fund method,

---

**15.** *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980).

**16.** "In the corporate litigation context, class action and derivative suits that result in the award or recovery of money or property or in the institution of improvements in internal operating procedures that are designed to produce prospective monetary savings are viewed for this purpose as fund creating actions." Donald J. Wolfe, Jr. & Michel A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9–5(a) (1998).

**17.** *Goodrich*, 681 A.2d at 1046 (citing *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6 th Cir.1993)).

**18.** *Goodrich*, 681 A.2d at 1046.

**19.** See *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881).

**20.** *Goodrich v. E.F. Hutton Group*, 681 A.2d 1039, 1046 (Del.1996)(citing *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1266 (D.C.Cir. 1993)). This method was established in *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3 rd Cir.1976).

**21.** See, e.g., *Ursic v. Bethlehem Mines*, 719 F.2d 670, 676–77 (3 rd Cir.1983).

**22.** See *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

**23.** Report of the Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237, 255 (1985).

**24.** See *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litig.*, 55 F.3d 768, 821 (3 rd Cir.1995).

noting that the Court of Chancery rightly "acknowledged the merit of the emerging judicial consensus that the percentage of recovery awarded should 'decrease as the size of the fund increases.'"[25] But that Court also stressed that "[t]his case establishes, once again, that the Court of Chancery's existing multiple factor approach to determining attorney's fee awards remains adequate for purposes of applying the equitable common fund doctrine."[26]

Delaware's fee jurisprudence in common fund cases thus commits fee determinations to Chancery's sound discretion.[27] We are told to employ several factors to reach an equitable result. *Sugarland Industries Inc. v. Thomas*[28] describes the relevant factors at length, but they include: (1) the results accomplished for the benefit of the shareholders; (2) the efforts of counsel and the time spent in connection with the case; (3) the contingent nature of the fee; (4) the difficulty of the litigation; and (5) the standing and ability of counsel involved.

*Sugarland* rejected more mechanical approaches to determining fee awards, explicitly disapproving the Third Circuit's "lodestar method."[29] By establishing a flexible standard, however, the Supreme Court has attempted to avoid the pitfalls associated with percentage of the fund and lodestar methods. For example, this Court is not obligated to award plaintiffs' counsel what might amount to a very high fee as expressed in terms of an hourly rate just because the percentage of the fund would yield such a result. To do so would create different incentive problems, including the risk of cheap early settlements. An inflexible percentage of the fund approach also would place excessive reliance on determining the appropriate percentage, and too little emphasis on attorney performance in a particular case. Conversely, the Court is not forced into making a difficult determination of fees based on hourly rates, which, in the end, may not be commensurate with the value actually created by the attorneys for the shareholders. Instead, the Supreme Court in *Sugarland* instructed the Court of Chancery to weigh a number of factors to reach an equitable result.

*Sugarland's* first factor is indeed its most important–the results accomplished for the benefit of the shareholders.[30] In practical terms, the benefit is the dollar amount of the fund created by the settlement. This is the heart of the *Sugarland* analysis. Here, the benefit is $2.5 million, payable to BankAmerica. The plaintiffs note that, in percentage terms, the fee requested (20 percent) falls within the

**25.** *Goodrich*, 681 A.2d at 1048 (quoting Report of the Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237, 256 (1985)). One should note, however, that the fee system that sanctions a declining percentage of the fund recovery creates a potential incentive problem. That is, counsel receives the highest return to effort by settling the case early, which may shortchange class members and provide counsel with a windfall. This may encourage cheap early settlements.

**26.** *Goodrich*, 681 A.2d at 1050.

**27.** *See Goodrich v. E.F. Hutton Group, Inc.*, Del.Supr., 681 A.2d 1039 (1996) (holding that the Court of Chancery was within its discretion in conditioning the award of attorney's fees upon claims actually submitted). *See also Chrysler Corp. v. Dann*, Del.Supr., 223 A.2d 384, 389 (1966).

**28.** Del.Supr., 420 A.2d 142 (1980).

**29.** *Id.* at 149–50.

**30.** *See Sugarland*, 420 A.2d at 149–50. *See also In re Maxxam Group, Inc. Stockholders Litig.*, Del.Ch., C.A. No. 8636, Allen, C., 1987 WL 10016 (Apr. 16, 1987), mem. op. at 31 ("[the] benefits achieved by the litigation constitute the factor generally accorded the greatest weight").

range awarded in earlier Delaware cases. They are correct. Just this year, this Court awarded an attorneys fee equal to 33 percent of the fund.[31]

The benefit created and the percentage of the fund figure, however, are not the only consideration. Percentage of the fund is only one possible method of calculating an award. Basic economic principles instruct us that it cannot always be the best. Two very different groups of attorneys might achieve, at the end of the day, the same settlement amount. Assume that settlement amount is $2,500,000. Counsel request 20 percent of that, or $500,000, in fees and expenses. Assume further that this first group of attorneys worked 1200 hours as a result of hotly contested litigation against formidable adversaries. The second group settled quickly, working only 190 hours. If we were to determine the fee based *strictly* on a percentage of the fund calculation, we would effectively award the first group $416 per hour, while the second group would be awarded $2,631 per hour. Is not the second group receiving a windfall?

Attorneys in the first group might be discouraged from bringing meritorious suits because this fee award may be less than their hourly rate (or opportunity cost) plus the cost of other risks associated with bringing the suit. To make it economically rational for them to take future cases, the fee must give them their normal hourly rate (the lost opportunity cost), a risk premium, plus a modest "incentive" premium, for lack of a better term.[32] The award given the second group is quite clearly too much because $2,631 per hour is far more than the sum of these three factors. It simply cannot be the case that a 426 percent increase over hourly rates, assuming an opportunity cost rate of $500 per hour, is necessary to preserve the wholesome incentives with which we are concerned. An appropriate and economically rational amount is something between the awards described in this example.

The Supreme Court recognized the above described problem with the percentage of the fund method. For this and other reasons, it created a flexible, multi-factor approach. This flexible approach borrows from both the percentage of the fund method as well as elements of the lodestar method. I have already discussed the fact that *Sugarland* stresses the importance of focusing on the benefit created by the lawyers when they obtain the settlement fund. Now I turn to the hourly rate, the single most important consideration in the lodestar method. The impor-

31. *See In re Intek Global Corp. Shareholders Litig.*, Del. Ch., C.A. No. 17207, Strine, V.C. (April 24, 2000). For examples of fee awards expressed as a percentage of the fund, *see Behrens v. Triathlon Broadcasting Co.*, Del. Ch., C.A. No. 16560, Jacobs, V.C. (Aug. 29, 2000) (awarding 23.5 percent); *In re Oppenheimer Capital Unitholders Litig.*, Del. Ch., C.A. No. 16022, Lamb, V.C. (Oct. 20, 1998) (awarding 25 percent). *See also* Irving Morris & Kevin Gross, "Attorneys' Fees Applications in Common–Fund Cases under Delaware Law: Benefit Achieved as 'the Common Yardstick,' " 324 *PLI/Lit* 167 (1987).

32. In the long run, the sums of the first two factors (opportunity cost plus the risk premium) in cases in which attorney's fees are awarded, should equal the amount the lawyer would receive were he to work consistently at his hourly rate. In other words, the risk premium serves to compensate the plaintiff's lawyer not only for the case at hand, but for those in which he was not successful. An "incentive" premium is necessary because it creates an incentive for this lawyer to bring class and derivative suits instead of opting for work that brings a guaranteed return of his hourly billing rate. Although, theoretically, this need be only one cent more than that hourly rate, this formula is not exact and, thus, the premium needs to be large enough to create this incentive at the margins.

tance of hourly rates is reflected in *Sugarland*'s second factor--the efforts of counsel and the time spent in connection with the case.

## C.

Although *Sugarland* explicitly allows courts to take hourly rates into consideration, judges in the Court of Chancery have seldom done so.[33] In cases where the percentage of the fund yields a reasonable hourly rate, this failure is inconsequential. In cases such as this one, however, where the percentage of the fund corresponds to more than $2,500 per hour, this failure may result in a windfall.

This case is not one where the simple calculation of the percentage of the fund correlates with a reasonable hourly rate. The plaintiffs' attorneys in this case will receive over $2,600 per hour if I approve a fee of 20 percent of the $2.5 million fund ($500,000). This appears to be much more than necessary to maximize future plaintiffs' incentives to bring meritorious cases and to litigate them efficiently. Nothing suggests that plaintiffs' attorneys' opportunity costs exceed $500 per hour. Moreover, such a high fee overcompensates plaintiffs' counsel for the risk they faced in bringing this lawsuit. In this case, no heroic efforts characterized counsels' performance. Nor was this lawsuit a particularly hard fought, cost-intensive suit. No accelerated proceedings were sought. No motion practice occurred. The risk premium, therefore, should not be particularly large.[34]

## D.

■■ For all of these reasons, I conclude that the $500,000 fee which counsel seeks exceeds the sum of the lost opportunity cost, a reasonable risk premium, and modest incentive premium. Instead, I award plaintiffs' counsel $250,000, including expenses. This is only 10 percent of the fund. But it represents an hourly rate of over $1300 (not including a deduction for litigation expenses), an amount that more than offsets the opportunity costs of plaintiffs' counsel, the cost associated with the risks involved in bringing the suit, as well as an appropriate incentive premium. I doubt that this award will discourage the filing of meritorious lawsuits; nor does it, in my opinion, increase the threat of inefficient litigation by conferring a too generous hourly rate.

The fee I award here also fully comports with the Supreme Court's five-factor test in *Sugarland*. First, the amount of the award, $250,000, fully takes into account the results accomplished for the benefit of the shareholders. This Court has awarded higher fund percentages in the past, but it has also awarded smaller percentages. A higher percentage is ultimately not appropriate in this case because other factors

---

**33.** Although this is true for cases determining attorney's fees in the context of a common fund, notable exceptions exist where attorney's fees have been determined in the context of a *therapeutic benefit* to the corporation. For examples of the latter, *see PaineWebber R & D Partners II, L.P. v. Centocor, Inc.*, C.A. No. 14405, Steele, V.C., 2000 WL 130632 (Jan. 31, 2000); *In re Golden State Bancorp, Inc.*, C.A. No 16175, Chandler, C., 2000 WL 62964 (Jan. 7, 2000); *In re Diamond Shamrock Corp.*, C.A. No. 8798, Jacobs, V.C., 1988 WL 94752 (Sept. 14, 1988).

**34.** The Supreme Court recognized the importance of risk as a part of a fee award. Although the Supreme Court's analysis in *Sugarland* is slightly different from the one offered here, the basic factors are the same. Two of the *Sugarland* factors bear on risk--the contingent nature of the fee, and the difficulty of the litigation. Though they may not be specifically mentioned, the risk premium I employ takes both factors into consideration.

weigh against it, particularly *Sugarland*'s second factor, the efforts of counsel and the time spent in connection with the case. Here, counsel spent only 190 hours on the case. It is this factor that mandates the fee be reduced from 20 percent, as plaintiffs request, to 10 percent. The last three *Sugarland* factors also suggest that this particular award should be in the range of $250,000. Although the fee was contingent, this award takes that into account, giving counsel a substantial premium over their hourly rate. The litigation was not particularly onerous; no heroic efforts, as I already mentioned, were made. Finally, counsel on both sides were well-respected and sophisticated corporate practitioners, but this factor does not alter the conclusion that $250,000 is an appropriate award here. Although many of the objectors challenged whether plaintiffs' counsel deserved the fee, I find that counsel performed at the highest professional level, and clearly deserve a fee for their efforts.

## IV.

Settlements in class and derivative actions sometimes raise difficult problems regarding the appropriate level of compensation for class or derivative counsel. Both the lodestar method and the *Sugarland* factors, at least in part, look to the market for legal services in determining fee awards. Fee determinations place the trial judge in the role of a regulator–fixing the appropriate fee rate because the market has failed to operate, or is unable to operate, in this particular setting.[35] In Delaware, the common law parameters, as described in *Sugarland,* form the basis for the Court's determination of the appropriate rate of pay for counsel's services. Those factors enable the Court to establish a fee award *ex post* that, if correctly applied, reduces the risk of overcompensating plaintiffs' counsel, yet properly rewards high performing counsel who efficiently prosecute meritorious lawsuits.[36] Applying those factors in this case, in the context of a $2,500,000 settlement fund, results in a fee award of $250,000, or 10 percent of the fund. I believe this to be a fair and reasonable fee award considering all of the *Sugarland* criteria in the circumstances of this case.

An order approving the settlement and awarding fees in accordance with this decision has been entered.

**35.** Market failure in this context results in part because a monopoly is created by class certification and appointment of lead counsel. A few judges have tried to create an alternative market based approach to the appointment of representative counsel–the so-called legal counsel auction model–in order to address fee award concerns arising from the traditional regulatory model of compensating class counsel. *See, e.g., In re Oracle Securities Litig.*, 131 F.R.D. 688 (N.D.Cal.1990).

**36.** Obviously, an *ex ante* determination of fees would reduce the uncertainty associated with serving as class counsel. That is one of the arguments cited in support of the lead counsel auction model. *See generally,* Andrew K. Niebler, In Search of Bargained–For Fees for Class Action Plaintiffs' Lawyers: The Promise and Pitfalls of Auctioning the Position of Lead Counsel, 54 Bus. Law 763 (1999). On the other hand, an *ex ante* fee system may not lead to a fully motivated class counsel, especially if the auction process has caused counsel to discount aggressively their bid. It also remains to be seen whether the increasing role of institutional shareholders will improve or worsen the fee determination process. To the extent that large, sophisticated shareholders are able to negotiate competitive legal fee arrangements, it may provide a superior *ex ante* approach to creating the proper incentives.