**COURT OF CHANCERY
OF THE
STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 3, 2023

Brian E. Farnan, Esquire
Michael J. Farnan, Esquire
Farnan LLP
919 N. Market Street
Wilmington, Delaware 19801

John P. DiTomo, Esquire
Alexandra M. Cumings, Esquire
Morris, Nichols, Arsht &
    Tunnell LLP
1201 N. Market Street
Wilmington, Delaware 19801

RE:   *Sciabacucchi v. Howley et al.*,
        C.A. No. 2021-0938-LWW

Dear Counsel:

This derivative suit challenged compensation granted to the directors of

nominal defendant TransDigm Group Incorporated.  I previously approved the

parties' settlement of this matter but took the plaintiff's application for an award of

attorneys' fees and expenses under advisement.  As discussed below, I conclude

that the plaintiff's counsel is entitled to an all-in fee and expense award of

$1 million.

## I. BACKGROUND[1]

TransDigm (the "Company") is a publicly-traded Delaware corporation headquartered in Cleveland, Ohio.[2] It was co-founded by W. Nicholas Howley, who serves as the Executive Chairman of the Company's Board of Directors.[3] Kevin Stein is the Company's President, Chief Executive Officer, and a member of its Board.[4] During most of the Company's fiscal 2020 (from October 1, 2019 to September 30, 2020), the Board also included ten non-employee directors.[5] The twelve Board members are the defendants in this action.

### A. The Complaint

On November 1, 2021, plaintiff Matthew Sciabacucchi—a purported stockholder of the Company—filed a derivative action advancing breach of fiduciary duty and unjust enrichment claims. The plaintiff alleged that the Board's four-member Compensation Committee awarded excessive compensation to themselves and the other six non-employee directors.

---

[1] The facts discussed in this decision are based upon the allegations in the Verified Complaint. They are untested and no findings of fact are being made.

[2] Verified Compl. (Dkt. 1) ("Compl.") ¶ 9.

[3] *Id.* ¶¶ 2, 10.

[4] *Id.* ¶ 2.

[5] *Id.* Dries passed away before the complaint was filed and was dismissed from the action on December 17, 2021. Dkt. 5.

The mean compensation of the Company's ten non-employee directors in fiscal 2020 was $785,318, which the plaintiff alleges was 176% greater than the median compensation paid to directors at companies in TransDigm's self-selected peer group.[6] The compensation packages of the Company's non-employee directors consisted of two main components: (1) November 15, 2019 grants of 3,000 stock options per director valued at $447,591 that vest upon the achievement of annual operating performance ("AOP") targets; and (2) dividend equivalent payments ("DEPs") paid on vested but unexercised options.[7]

DEPs are payments made to option holders whenever the Board declares a dividend on the Company's common stock. The option holder receives cash remuneration in an amount equal to the number of options that are vested but unexercised relative to dividends paid to stockholders. That is, the DEPs were calculated by multiplying the dividend by the number of a director's vested but unexercised options.[8]

From 2012 to 2021, the Company declared special dividends in each calendar year except for 2015 and 2018.[9] On December 20, 2019, for example, the

---

[6] Compl. ¶¶ 3, 26, 31.

[7] Id. ¶ 5.

[8] Id. ¶ 5 n.1; see also id. ¶ 67.

[9] Id. ¶¶ 71-72.

Board declared a special cash dividend of $32.50 on each outstanding share of common stock and cash equivalent DEPs on options granted under its stock option plans.[10]  The 2019 option awards, which were granted but unvested on the payment date of the special dividend, were eligible for DEPs if they vested through the achievement of AOP targets.[11]

The plaintiff averred that by the end of fiscal 2020, "it was clear that the performance goals were not attainable."[12]  He contended that the Compensation Committee subsequently changed the terms of the directors' options to allow for vesting in 2020 as originally scheduled.  Further, the AOP criteria for options granted but unvested in 2020 were allegedly changed to ensure they would vest in the future.[13]

The plaintiff also alleged that Howley and Stein were awarded "significant compensation in 2020" without a "valid business reason[]."[14]  Because compensation packages for non-employee directors and executives were approved that same day, the plaintiff assumed there was a quid pro quo.  Specifically, he

---

[10] *Id.* ¶ 76.

[11] *Id.* ¶¶ 76-77.

[12] *Id.* ¶ 80.

[13] *Id.* ¶¶ 81-83.

[14] *Id.* ¶ 63.

asserted that "there was an express or implied arrangement pursuant to which the Compensation Committee awarded Stein and Howley a lavish package so that they would not object when the [non-employee directors] awarded themselves the grossly excessive compensation."[15]

### B. The Settlement

On January 20, 2022, the parties stipulated to an extension for the defendants to respond to the Verified Complaint.[16] That deadline was deferred by the parties several more times.[17] On June 23, the parties informed me that they had executed a term sheet to resolve the action, subject to final settlement documentation and court approval.[18] A Stipulation and Agreement of Compromise, Settlement and Release was filed on August 19.[19]

The settlement consideration consisted of several therapeutic terms. The primary term was that—for fiscal 2021 and beyond—the Company agreed it will no longer pay DEPs in cash. Rather, the DEPs will be settled by reducing the exercise price of the directors' vested but unexercised options. As part of the settlement, the

---

[15] *Id.*

[16] Dkts. 7-8.

[17] Dkts. 9-11.

[18] Dkt. 12 Ex. A ("Term Sheet").

[19] Dkt. 13.

"Company . . . agree[d]" that this change provided a "benefit" worth "$23.8 million" to the Company and that it would "provide affiant testimony" in support.[20]  In addition:

- The Compensation Committee charter would be amended to prohibit the use of overlapping metrics in the Company's long-term and short-term incentive plans for executive officers.[21]

- In fiscal 2022, the Company returned to its AOP vesting criteria for options granted in fiscal 2020, 2021, and 2022; and the defendants agreed to cause the Company's option plan to continue to use performance-based vesting criteria.[22]

- The defendants agreed to cause options granted pursuant to the Company's option plan to vest based only upon achieving the established performance targets for the current year.  The Company will not make discretionary changes to those targets during that year.[23]

The Company also confirmed that the Chairman of the Board would remain a non-executive position for three years—as it was before this action was filed.[24]  In exchange for these terms, the plaintiff agreed to a release of claims.[25]

After the provision of notice to stockholders, a settlement hearing was held on November 10, 2022.  The plaintiff's counsel argued that the DEP-related benefit is

---

[20] Term Sheet ¶ 1.b.; *see also* Stipulation and Agreement of Compromise, Settlement and Release (Dkt. 13) ("Settlement Stip.") ¶ 2.

[21] Settlement Stip. ¶ 3.

[22] *Id.* ¶ 4.

[23] *Id.* ¶ 5.

[24] *Id.* ¶ 6.

[25] *Id.* ¶ 8.a.

significant because the Company may retain $23.8 million of "cash on hand by requiring DEPs to be paid to directors via a reduction to the strike price of the director's vested but unexercised options instead of being paid in cash."[26] For this benefit, along with the "package of tailored, overlapping reforms designed to prevent a recurrence of the alleged misconduct," the parties asked that the settlement be approved as fair and reasonable.[27] The plaintiff's counsel sought a fee and expense award of $2.8 million, which the defendants agreed not to oppose. The plaintiff also requested a $4,000 service award.

At the settlement hearing, I questioned whether the settlement could be valued at $23.8 million. The plaintiff did not submit any expert analysis or valuation data to support his assessment and the figure offered was not discounted to present value. Nonetheless, I approved the settlement after weighing the "give" and the "get" of its terms.[28] I found that the release was appropriately tailored to the plaintiff's claims and that the settlement consideration in totality provided "a meaningful benefit to the Company" despite the absence of a cash recovery.[29] I took the requests for a fee

---

[26] Pl.'s Appl. for Approval of the Settlement, an Award of Att'ys' Fees and Expenses, and Pl.'s Service Award (Dkt. 17) ("Settlement Br.") 14 (citing Settlement Stip. ¶ 2).

[27] *Id.* at 15.

[28] *See* Final Order & J. (Dkt. 25); Tr. of Nov. 10, 2022 Settlement Hr'g (Dkt. 27) ("Settlement Hr'g Tr.") 40.

[29] Settlement Hr'g Tr. 42-43.

award and a service award under advisement and gave the plaintiff's counsel an opportunity to submit supporting material.[30]

Following the settlement hearing, the plaintiff filed a supplemental brief in further support of his application for a fee award.[31] He also submitted an affidavit from William Jeffers of The Griffing Group, LLC (the "Jeffers Affidavit"), who was retained by the plaintiff's counsel to provide an analysis of the net present value of certain benefits accruing to the Company from the settlement.[32] More recently, the plaintiff submitted data underlying the Jeffers Affidavit.[33]

## II. ANALYSIS

"When a plaintiff pursues a cause of action relating to the internal affairs of a Delaware corporation and generates benefits for the corporation or its stockholders," she may recover an award of attorneys' fees.[34] Delaware courts look to the *Sugarland* factors when assessing a fee request. These factors include "the benefit

---

[30] *Id.* at 48-49 ("I think the current request is high and unsupported. I lack the data to quantify it in the way that the plaintiff is asking me to.").

[31] Pl.'s Suppl. Br. in Further Supp. of his Appl. for an Award of Att'ys' Fees and Expenses and a Service Award (Dkt. 28) ("Pl.'s Suppl. Br.").

[32] Aff. of William Jeffers (Dkt. 28) ("Jeffers Aff.").

[33] Dkt. 32.

[34] *In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006, at *2 (Del. Ch. Mar. 28, 2011).

achieved, the difficulty and complexity of the litigation, the effort expended, the risk-taking, [and] the standing and ability of counsel."[35]

It is the plaintiff's burden to establish the value of the claimed benefit.[36] It is also plaintiff's burden to demonstrate the reasonableness of the amount sought for achieving that benefit.[37] "The determination of any award is a matter within the sound judicial discretion of the Court of Chancery."[38]

### A. The Benefit Conferred

The benefit achieved is generally given the greatest weight of the *Sugarland* factors.[39] The only benefit that the plaintiff attempted to quantify is the change to

---

[35] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1255 (Del. 2012); *see also Hollywood Firefighters' Pension Fund v. Malone*, 2021 WL 5179219, at *7 (Del. Ch. Nov. 8, 2021); *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149-50 (Del. 1980).

[36] *See In re Am. Real Estate P'rs., L.P. Litig.*, 1997 WL 770718, at *6 (Del. Ch. Dec. 3, 1997); *In re Diamond Shamrock Corp.*, 1988 WL 94752, at *4 (Del. Ch. Sept. 14, 1988).

[37] *See Korn v. New Castle Cnty.*, 2007 WL 2981939, at *2, *5 (Del. Ch. Oct. 3, 2007); *Boyer v. Wilmington Materials, Inc.*, 1999 WL 342326, at *1, *3-4 (Del. Ch. May 17, 1999).

[38] *In re Abercrombie & Fitch Co. S'holders Deriv. Litig.*, 886 A.2d 1271, 1273 (Del. 2005) (quoting *In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 293 (Del. 2002)).

[39] *See, e.g.*, *In re Cox Radio, Inc. S'holders Litig.*, 2010 WL 1806616, at *20 (Del. Ch. May 6, 2010) (noting that the size of the benefit is of "paramount importance" to the *Sugarland* analysis); *In re Nat'l City Corp. S'holders Litig.*, 2009 WL 2425389, at *5 (Del. Ch. July 31, 2009) ("This Court has consistently noted that the most important factor in determining a fee award is the size of the benefit achieved."), *aff'd*, 998 A.2d 851 (Del. 2010) (TABLE).

how DEPs are paid. He asserts that the other therapeutic benefits obtained also have "significant value" based on precedent.[40]

Initially, the plaintiff's quantification of the DEP-related benefit relied upon an affidavit signed by the Company's Chief Financial Officer Mike Lisman (the "Lisman Affidavit").[41] In the Lisman Affidavit, the Company "acknowledged"—as it had promised to do—that paying DEPs via a reduction in the strike price of options instead of cash would increase the amount of cash on hand, thereby "confer[ring] a benefit on the Company in the amount of $23.8 million."[42]

Lisman explained that this value was calculated using the following analysis. First, the options directors had received to date were considered alongside anticipated dividend payments in the Company's five-year projections.[43] A 15% stock growth rate was assumed—the percentage the Company uses in the ordinary course of business when setting the size of option awards. The "time difference of money between the dividend date and the projected exercise date" was valued by applying a 3% rate of growth each year, which is greater than the current rates

---

[40] Pl.'s Suppl. Br. 11.

[41] Settlement Stip. Ex. D ("Lisman Aff.").

[42] *Id.* ¶¶ 4, 8.

[43] *Id.* ¶ 6.

available to the Company but still a "reasonable assumption."[44]    An eight-year

holding period for the options was also assumed, given that it is the average holding

period for all directors.

The Jeffers Affidavit submitted after the settlement hearing opined that

valuing this benefit at $23.8 million is conservative since it assumes the Company

will reinvest the cash saved at a rate of 3%, which is "equivalent to the expected rate

of inflation."[45]    Jeffers explained that the Company's weighted average cost of

capital is a more appropriate rate.  Using that rate, he calculated the net present value

of the DEP component of the settlement to be $68.4 million.[46]  Further, he stated that

reducing the strike price of the directors' vested but unexercised options should not

affect this value.  The Company can, in his view, deploy the savings achieved by not

issuing DEPs in cash, which has the potential to generate upside for the Company.[47]

The Lisman Affidavit and Jeffers Affidavit show that the settlement will likely

yield a savings for the Company, which is a meaningful benefit that supported

approving the settlement.  But even after giving the plaintiff a do-over to submit

support for his fee application, the proffered valuation remains of limited utility for

---

[44] *Id.* ¶ 7.

[45] Jeffers Aff. ¶ 24; *see id.* ¶ 25.

[46] *Id.* ¶ 8.

[47] *Id.* ¶¶ 22-24.

purposes of fixing a fee award.[48]  The Company's realization of a $28.3 million

benefit from the change to DEPs rests on a series of assumptions and unknowns.  I

do not know, for example, whether the Company will issue dividends to stockholders

or grant options to directors as anticipated, whether a 15% stock growth rate will

occur, or how the Company might reinvest any cash it saves.  As such, the benefit is

dissimilar to a self-pricing and certain cash fund, where a percentage of the benefit

approach is typically used to guard against windfall awards.

The percentage of the benefit is "only one possible method of calculating an

award.  Basic economic principles instruct us that it cannot always be best."[49]  A

percentage-based assessment may be particularly inapt for a projected therapeutic

---

[48] *See In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1137 (Del. Ch. 2011) (discussing the "informational vacuum" created in reviewing an uncontested fee application since the "adversity of interests that drives the common law process dissipates").

[49] *Seinfeld v. Coker*, 847 A.2d 330, 337 (Del. Ch. 2000).

benefit that is speculative or difficult to quantify.[50] It is for this reason that Delaware

courts follow a "flexible, multi-factor approach."[51]

### B. The Remaining *Sugarland* Factors

The other *Sugarland* factors counsel against a fee in the range sought.[52]

The plaintiff's counsel pursued the case on a contingent basis. Yet the

litigation did not present true risk. Relatively little time was invested and few

---

[50] *See In re Golden State Bancorp Inc. S'holders Litig.*, 2000 WL 62964, at *3 (Del. Ch. Jan. 7, 2000) ("Oftentimes, when this Court determines fee awards in a therapeutic benefit case, it uses a quantum meruit analysis. Under such an analysis, the Court adds a premium to the plaintiffs' attorneys typical noncontingency fee in proportion to the benefit the plaintiffs' attorneys achieved for their clients."); *La. State Emps.' Ret. Sys. v. Citrix*, 2001 WL 1131364, at *9-10 (Del. Ch. Sept. 19, 2001) (declining to "engage in complicated and highly speculative intellectual exercises in attempting to quantify what is, in essence, the non-quantifiable benefit achieved by" the withdrawal of a proposed amendment to a stock option plan; rejecting the plaintiffs' argument the benefit was worth $183 million and instead awarding a $140,000 fee "based on quantum meruit principles"); *Siegman v. Palomar Med. Techs. Inc.*, 1998 WL 409352, at *6 (Del. Ch. July 13, 1998) (awarding $125,000 on a quantum meruit basis rather than the $550,000 sought where the plaintiff achieved a substantial, but difficult to quantify corporate benefit claimed to be worth $50,000,000); *see also Sciabacucchi v. Salzberg*, 2019 WL 2913272, at *6 (Del. Ch. July 8, 2019) (discussing the "drawbacks" to the lodestar method and noting that "if there are precedents on which to base a fee award . . . then the court should look in the first instance to those precedents" and "fall back to the quantum meruit version of the lodestar approach" only if such precedent is lacking).

[51] *Seinfeld*, 847 A.2d at 337.

[52] I do not question the standing and ability of counsel.

expenses were incurred.[53]  The case offered a "ready-made settlement opportunity" and was filed "with an obvious and well-marked exit in sight."[54]

The DEPs created a layer of factual difficulty.  Still, the litigation was not complex in terms of its legal theory.  It largely followed the pattern of other post-*Investors Bancorp* lawsuits challenging non-employee director compensation.[55]

The plaintiff's non-Delaware counsel invested a total of 724.6 hours in the matter, which includes time spent serving a books and records demand through the signing of a settlement term sheet.[56]  The plaintiff's Delaware counsel spent a total of 4.8 hours on the case.[57]  This yields a total lodestar of $607,069.  As a crosscheck,[58] a $2.8 million fee award implies an hourly rate of $3,838.77 and a 4.6x multiplier.

---

[53] *See* Aff. of Gregory M. Nespole in Supp. of Pl.'s Appl. for Approval of the Settlement, an Award of Atty's' Fees and Expenses, and Pl.'s Service Award (Dkt. 17) ("Nespole Aff.") ¶¶ 3, 5.

[54] *Emerson Radio*, 2011 WL 1135006, at *6; *see Knight v. Miller*, 2023 WL 3750376, at *7 (Del. Ch. June 1, 2023) ("Since [*Investors Bancorp*], the Court of Chancery has had a steady diet of breach of fiduciary duty suits regarding allegedly excessive director compensation.").

[55] *See Knight*, 2023 WL 3750376, at *7-8 n.80 (listing cases).

[56] Nespole Aff. ¶ 3.

[57] Decl. of Brian E. Farnan in Supp. of Pl.'s Appl. for Approval of the Settlement, an Award of Att'ys' Fees, and Pl.'s Service Award (Dkt. 18) ¶ 3 (excluding paralegal time).

[58] *See Brinckerhoff v. Texas E. Prods. Pipeline Co., LLC*, 986 A.2d 370, 396 (Del. Ch. 2010).

It is obvious from these figures that a $2.8 million award is unwarranted. An hourly rate of $3,838.77 would overcompensate counsel, who did not engage in any hard-fought litigation.[59] A multiplier of 4.6x has been deemed reasonable for cases in an advanced stage.[60] But it seems extreme for an opportunistic suit that settled right out of the gate.[61]

## C. The Appropriate Fee Award

After a holistic review of the *Sugarland* factors, I cannot conclude that a $2.8 million award would be equitable.[62] It would impose a substantial cost on the nominal defendant in exchange for therapeutic benefits of uncertain consequence. It would also well exceed the amount covering counsel's opportunity cost plus "a risk premium" and a "modest 'incentive' premium."[63]

---

[59] *See Seinfeld*, 847 A.2d at 338 (concluding that $2,600 per hour would overcompensate counsel where "no heroic efforts characterized counsel's performance").

[60] *S'holder Representative Servs. LLC v. Shire US Hldgs., Inc.*, 2021 WL 1627166, at *3 n.14 (Del. Ch. Apr. 27, 2021) (citing cases).

[61] *See In re James River Grp., Inc. S'holders Litig.*, 2008 WL 160926, *2 (Del. Ch. Jan. 8, 2008) (explaining that the court exercises its discretion to fashion an award that "furthers the policy objectives of encouraging monitoring behavior by stockholders and protecting the assets of Delaware corporations from unreasonable opportunistic demands").

[62] *See In re Appraisal of Shell Oil Co.*, 1992 WL 321250, at *4 (Del. Ch. Oct. 30, 1992) ("The trial court has considerable discretion in weighing and balancing the various *Sugarland* factors.").

[63] *Seinfeld*, 847 A.3d at 337.

Instead, I award the plaintiff's counsel $1 million (inclusive of expenses) based on a review of precedent. This amount is equal to the largest fee granted in a comparable therapeutic settlement of excessive non-employee director compensation claims.[64] In *In re Salesforce.com*, *Inc. Derivative Litigation*, the Court of Chancery awarded $1 million in attorneys' fees where the parties agreed to cap average non-employee director compensation at the 75th percentile of the company's peers, which reduced the average annual compensation by approximately $200,000 per director, in addition to several other governance reforms.[65] A $1 million fee award is not only on the high side compared to those in similar cases,[66] but also reasonable in the context of this low-risk matter.

---

[64] *See In re Salesforce.com, Inc. Deriv. Litig.*, C.A. No. 2018-0922-AGB (Del. Ch. Dec. 17, 2019) (TRANSCRIPT); *see also Olson v. EV3, Inc.*, 2011 WL 704409, at *8 (Del. Ch. Feb. 21, 2011) ("Precedent awards from similar cases may be considered for the obvious reason that like cases should be treated alike."). The only larger fee awarded in the context of non-employee director compensation claims involved a settlement that mandated three separate ratification votes. *Pascal v. Czerwinski*, C.A. No. 2020-0320-SG, at 19-20 (Del. Ch. Feb. 7, 2022) (TRANSCRIPT) (awarding $1.3 million for "an ideal settlement under the circumstances" that gave stockholders the opportunity to decide whether the compensation was fair). No such votes are contemplated here.

[65] *Salesforce.com*, C.A. No. 2018-0922-AGB, at 55-56, 61.

[66] *E.g.*, *Solak v. Sato*, C.A. No. 2020-0775-JTL, at 42-44, 51 (Del. Ch. Apr. 16, 2021) (TRANSCRIPT) (awarding $300,000 where the plaintiff's expert attempted to quantify potential economic benefits of a settlement of claims that non-employee director compensation exceeded the average of the company's peers); *Alvarado v. Lynch*, C.A. No. 2020-0237-LWW, at 30-34 (Del. Ch. June 21, 2021) (TRANSCRIPT) (awarding $400,000 where the plaintiff alleged excessive cash and options were awarded to non-employee directors and some claims survived a motion to dismiss); *see also Howland v. Kumar*, C.A. No. 2018-0804-KSJM, at 12-15, 32 (Del. Ch. Sept. 11, 2019) (TRANSCRIPT) (awarding

As a crosscheck, a $1 million fee award is appropriate considering the time invested by the plaintiff's counsel. An award of $1 million implies an hourly rate of $1,370.99, which exceeds the billing rate of every attorney representing the plaintiff in this action.[67]   The award is approximately 1.65x the lodestar.  The plaintiff's counsel are therefore receiving a fair premium for their work.[68]

## III.   CONCLUSION

The plaintiff obtained some meaningful therapeutic benefits for the Company. The value of those benefits is neither certain nor straightforward.  The $2.8 million award sought well exceeds that granted in any comparable case and would provide the plaintiff's counsel with a windfall.  After weighing the *Sugarland* factors and reviewing precedent, I conclude that the plaintiff's counsel are entitled to a fee and

---

$362,500 in attorneys' fees where governance reforms were agreed to in a settlement of claims about an alleged improper repricing of company stock options).

[67] *See* Nespole Aff. ¶ 3 (listing partner rates at $1,050 per hour, $1,000 per hour, and $975 per hour).

[68] *Seinfeld*, 847 A.2d at 334 ("This Court has proceeded in the past on the unstated premise that awarding large fees will necessarily produce the incentives of encouraging meritorious suits and encouraging efficient litigation.  But a point exists at which these incentives are produced, and anything above that point is a windfall."); *Nat'l City*, 2009 WL 2425389, at *5 (explaining that a fee award should both "encourage plaintiffs' attorneys to remain alert in identifying and filing claims that will allow courts to catch the occasional instance of overreaching board conduct" and "deter frivolous lawsuits against defendants, and to avoid financial windfalls to plaintiffs' attorneys").

expense award of $1 million. In addition, the plaintiff may recover a service award

of $4,000 to be paid from his counsel's fee award.[69]

To the extent necessary for this decision to take effect, IT IS SO ORDERED.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

---

[69] *See Raider v. Sunderland*, 2006 WL 75310, at *1 (Del. Ch. Jan. 4, 2006) (discussing that a service award provides the representative plaintiff with "an incentive to proceed with costly litigation . . . with uncertain outcomes"). Here, the plaintiff sought inspection of the Company's books and records and pursued litigation on behalf of the Company. Although his efforts created a benefit for the Company, they were modest and would not support a higher service award.