# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | | |
|---|---|---|---|
| ROBERT GARFIELD, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| v. | ) | C.A. No. 2022-0132-MTZ | |
| | ) | | |
| BOXED, INC., | ) | | |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OPINION

Date Submitted: October 19, 2022
Date Decided: December 27, 2022

David A. Jenkins, Neal C. Belgam, Jason Z. Miller, SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Steven J. Purcell, Robert H. Lefkowitz, Anisha Mirchandani, PURCELL & LEFKOWITZ LLP, New York, New York, *Attorneys for Plaintiff Robert Garfield.*

Paul J. Loughman, Joseph M. Turk, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Mark T. Stancil, WILKIE FARR & GALLAGHER LLP, Washington, D.C.; Betsy L. Feldman, WILKIE FARR & GALLAGHER LLP, New York, New York, *Attorneys for Defendant Boxed, Inc.*

**ZURN, Vice Chancellor.**

This opinion considers the corporate benefit created by, and commensurate attorneys' fees payable to, a stockholder who advised the company's board that two stockholder votes in anticipation of a merger did not comply with Delaware law. The plaintiff is a class A common stockholder in a publicly traded special purpose acquisition company. The SPAC had class A common stockholders and class B common stockholders. The SPAC was set to acquire a company in a merger, with the SPAC as the surviving post-transaction entity. The post-transaction entity would have only one class of common stock.

The SPAC's stockholders had to approve the transaction, as well as several ancillary proposals that included updating the SPAC's charter. One of the proposed charter amendments increased the number of authorized shares of class A common stock. Another proposed amendment altered the vote required for the board to change the number of authorized shares in the future.

Before the votes, the plaintiff wrote a letter to the SPAC's board asserting the proposed voting structure for those amendments violated the class A common stockholders' voting rights under Section 242(b) of the Delaware General Corporation Law. He demanded the SPAC provide the class A common stockholders a right to vote on those two amendments as a standalone class, instead of with the class B common stockholders. The SPAC amended the merger agreement and supplemented the proxy to make the changes the plaintiff demanded.

1

The SPAC's stockholders voted to approve the merger and the proposed charter amendments, the merger was consummated, and the amended charter went into effect.

The plaintiff then filed an action in this Court seeking attorneys' fees and expenses for the benefits he conferred on the company and its stockholders by facilitating statutorily compliant votes. The plaintiff argues his inspiration of a class A vote on the charter amendments preserved the stockholder franchise, the post-transaction entity's capital structure, and the transaction itself. The defendant company asserts the changes were unnecessary because the proposed charter and voting structure were already statutorily compliant. The defendant interprets the SPAC's original charter to provide one class of common stock with two series, "Class A" and "Class B," that under Section 242 could vote together on the amendments affecting the common class. Under that interpretation, no standalone class A vote was necessary, and so the plaintiff did not confer a substantial benefit warranting a fee award.

On the parties' cross-motions for summary judgment, I agree with the plaintiff's interpretation of the original charter as providing for two classes, rather than series, of common stock. Under that interpretation, the class A stockholders had a statutory right to vote as a class on the two charter amendments, so the plaintiff's demand was meritorious when made.

If those amendments were invalidly approved, they would call the new stock issuances and the merger into question. Accordingly, I conclude the plaintiff conferred a substantial benefit on the defendant and its stockholders. The plaintiff's counsel is entitled to fees and expenses commensurate with that benefit. The plaintiff has asked for a premium award in this matter, asserting among other reasons that it was the first of several identical but unrelated actions filed by plaintiff's counsel to be taken under advisement. I award a fee based solely on corporate benefit, and decline to award such a premium.

## I. BACKGROUND[1]

The defendant, a SPAC then known as Seven Oaks Acquisition Corp. (the "Company" or "Defendant"), is a Delaware corporation headquartered in New York.[2] The Company's Amended and Restated Certificate of Incorporation (the "Original Charter") authorized the issuance of 401 million shares: 380 million shares of Class A common stock, 20 million shares of Class B common stock, and

---

[1] For purposes of the pending motions, I draw the following facts from the Verified Complaint, available at Docket Item ("D.I.") 1 [hereinafter "Compl."], as well as the documents attached to, and integral to it, admissions on file, together with any affidavits and public filings. Ct. Ch. R. 56(c); *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that 'are required by law to be filed, and are actually filed, with federal or state officials.'" (quoting *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007))).

[2] Compl. ¶ 14.

1 million shares of preferred stock.[3] The Original Charter also provided that except as otherwise required by law (i.e., Section 242(b) of the DGCL) or the provisions of the Original Charter, the Class A and Class B common stockholders would vote together as a single class on all matters submitted to stockholders for approval.[4]

On December 22, 2020, the Company conducted an IPO.[5] On March 1, 2021, plaintiff Robert Garfield ("Plaintiff") purchased publicly traded units in the Company, which he has held at all relevant times.[6]

On June 14, 2021, the Company announced it had entered into an Agreement and Plan of Merger (the "Merger Agreement") to acquire Giddy Inc. d/b/a Boxed Inc., an e-commerce grocery shopping platform selling bulk consumable goods to households and businesses (the "Combination").[7]

On October 22, the Company filed a Form S-4/A Registration Statement with the Securities and Exchange Commission (the "Proxy") in connection with a special

---

[3] D.I. 23, Transmittal Affidavit of Anisha Mirchandani, at Ex. A, Amended and Restated Certificate of Incorporation of Seven Oaks Acquisition Corp. § 4.1 [hereinafter "Original Charter"].

[4] Original Charter § 4.3(a)(iii).

[5] Compl. ¶ 18.

[6] *Id.* ¶ 13; D.I. 21, Transmittal Affidavit of Joseph M. Turk in Support of Defendant Boxed, Inc.'s Combined Answering Brief in Opposition to Plaintiff Robert Garfield's Motion for Summary Judgment and Opening Brief in Support of its Cross-Motion for Summary Judgment [hereinafter "Turk DOB Aff."], at Ex. A, Plaintiff's Responses and Objections to Defendant's First Set of Interrogatories at Response No. 2.

[7] Compl. ¶ 2.

meeting scheduled for December 7.[8] The Proxy set forth seven proposals for Class A and Class B common stockholders to consider; five specific proposals out of the seven had to be accepted to consummate the Combination.[9] One of those five proposals was an amended charter, attached to the Proxy at Annex B (the "Proposed Charter").[10] The Proxy singled out several proposed amendments to the Original Charter.[11]

One, the "Share Increase Amendment," would increase the authorized shares of the Company's Class A common stock by 220 million shares—from 380 million to 600 million.[12] The Share Increase Amendment would provide for

[8] *Id.* ¶ 6; Seven Oaks Acquisition Corp., Registration Statement (Form S-4/A) (Oct. 22, 2021) [hereinafter "Proxy"]. "The Company filed an original registration statement on July 20, 2021, and amended proxies on September 9, 2021 and September 29, 2021, but those registration statements did not disclose that the Board had adopted the Share Increase Amendment increasing the number of authorized shares of Class A Common Stock by 220 million shares. This was first disclosed in the October 22, 2021 Proxy." Compl. at 4 n.2.

[9] *E.g.*, Proxy at Notice of Special Meeting of Stockholders; Compl. ¶ 2. As of the date of the Proxy, the Company had not issued any preferred stock. Proxy at 136.

[10] Proxy at Notice of Special Meeting of Stockholders, 2, 4, 87–88; *see also id.* at v (defining "Proposed Charter . . . a copy of which is attached as Annex B to this proxy statement/prospectus").

[11] *Id.* at 134–35; *see also id.* at 7.

[12] Compl. ¶¶ 2–3, 34; *see also* Proxy at 10 ("If the Business Combination is completed, (i) each share of Seven Oaks' Class A common stock will remain outstanding and automatically become a share of New Boxed common stock, and (ii) each share of Seven Oaks' Class B common stock will be converted into one share of New Boxed common stock."); *id.* at iv (defining "Founding Shares" as "the Seven Oaks Class B common stock initially purchased by the Sponsor in a private placement prior to the Initial Public Offering and the Seven Oaks Class A common stock that will be issued upon the conversion of such of such Seven Oaks Class B common stock in accordance with the [Original] Charter and

(ii) the increase of the total number of authorized shares of all classes of capital stock, par value of $ 0.0001 per share, from 401,000,000 shares to 660,000,000 shares, consisting of 600,000,000 shares of common stock, par value $ 0.0001 per share and 60,000,000 shares of preferred stock, par value $0.0001 per share[.][13]

The other proposed amendment at issue in this matter, the "Opt-Out Provision Amendment," was not specifically identified in the Proxy, apart from its inclusion in the attached Proposed Charter. It changed the voting structure for increasing or decreasing the number of authorized shares in the future, opting out of Section 242(b)(2). The Proposed Charter read:

> Subject to the rights of any holders of any outstanding series of Preferred Stock, the number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the DGCL.[14]

The Proxy disclosed that approval of the Proposed Charter "require[d] the affirmative vote of the holders of at least a majority of the outstanding [Company] Shares entitled to vote thereon, voting as a single class."[15]

---

in connection with the consummation of the Business Combination"); *id.* at 7, 134 (describing the proposed increase in authorized shares of New Boxed common stock).

[13] Proxy at 7; *accord id.* at 134; *id.* at B-1 (amending the Original Charter at Article IV).

[14] *Id.* at B-1 (amending the Original Charter at Article V).

[15] *Id.* at 3, 88; Compl. ¶ 44.

6

By letter dated October 29, 2021, Plaintiff sent a presuit demand to the Company's board of directors (the "Demand" and the "Board") insisting the Board afford the Class A common stockholders a separate class vote on the Share Increase Amendment and the Opt-Out Provision Amendment (together, the "Challenged Amendments").[16] He contended under the Original Charter and Section 242(b)(2), both Challenged Amendments required approval of the Class A common stockholders voting as a separate class.[17] Plaintiff asked the Board to take immediate action to amend the Proxy and provide the Class A common stockholders with a separate class vote on the Challenged Amendments.[18]

On November 26, the Company filed a Form 8-K disclosing a summary of amendments to the Merger Agreement and the Proposed Charter.[19] A "Supplement to [the] Proxy Statement" also summarized the amendments to the Proxy.[20] According to these disclosures, the amended Merger Agreement would require approval of the Proposed Charter by the affirmative vote of the majority of the Class A common stockholders, voting separately as a single class.[21] The Class A common

---

[16] Compl. ¶¶ 8, 50; Compl. Ex. A [hereinafter "Demand"].

[17] Demand at 8, 10.

[18] Compl. ¶ 8; Demand at 10.

[19] Compl. ¶ 9; Compl. Ex. B [hereinafter "Form 8-K"].

[20] Form 8-K at Supplement to Proxy Statement.

[21] *Id.* at Item 1.01; *id.* at Ex. 2.1, Amendment to Agreement and Plan of Merger, dated November 26, 2021.

stockholders would also have a separate class vote on the Share Increase Amendment and the Opt-Out Provision Amendment.[22]

On December 7, the Company held the special meeting and the Company's Class A common stockholders, voting as a separate class, approved the Challenged Amendments.[23] The Combination was completed the next day, and the Proposed Charter became effective.[24]

On February 8, 2022, Plaintiff filed a Verified Complaint (the "Complaint") seeking an award of attorneys' fees and expenses for benefit conferred on the Company.[25] On May 2, Defendant answered the Complaint.[26] On July 22, Plaintiff moved for summary judgment.[27] On September 8, Defendant cross-moved for summary judgment.[28] The parties briefed the motions, and I heard argument on October 19.[29]

---

[22] *Id.* at Supplement to Proxy Statement.

[23] Compl. ¶ 9.

[24] *Id.*

[25] Compl.

[26] D.I. 5.

[27] D.I. 17 [hereinafter "POB"].

[28] D.I. 19; D.I. 20 [hereinafter "DOB"].

[29] D.I. 23 [hereinafter "PAB"]; D.I. 26 [hereinafter "DAB"]; D.I. 33; D.I. 34 [hereinafter "Hr'g Tr."].

## II.    ANALYSIS

This Court will grant a motion for summary judgment where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[30]  In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party, and the moving party has the burden of demonstrating that no material question of fact exists.[31]  Where "the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[32]

### A.    Plaintiff Conferred A Corporate Benefit Worthy Of Fees And Expenses.

The corporate benefit doctrine allows a party to recover fees and expenses from a corporation where that party conferred a substantial benefit upon the corporate enterprise or its stockholders.[33]  Delaware courts award fees to plaintiffs' counsel for the beneficial results they produced for the defendant corporation "even

---

[30] Ct. Ch. R. 56(c).

[31] *Weil v. VEREIT Operating P'ship, L.P.*, 2018 WL 834428, at *3 (Del. Ch. Feb. 13, 2018).

[32] Ct. Ch. R. 56(h).

[33] *Dover Hist. Soc., Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1090 (Del. 2006).

9

without a favorable adjudication."[34]  A court has discretion to award attorneys' fees if the plaintiff demonstrates "(a) the claim was meritorious when filed; (b) the action was benefitting the corporation; . . . and (c) the benefit was causally related to the lawsuit."[35]  With respect to the third factor, "there is a rebuttable presumption the suit and the benefit were causally related because the defendant is in the best position to know the events, reasons, and decisions behind its action."[36]

Here, Defendant does not attempt to rebut the causal presumption.[37]  Rather, it opposes the first two factors.  For the reasons that follow, I conclude Plaintiff's Demand was meritorious when made and it conferred a substantial benefit on the Company and its stockholders.  The benefit justifies an award comparable to similar statutory fixes.

### 1.    The Demand Was Meritorious When Made.

A claim is meritorious when made if it is capable of surviving a motion to dismiss and the plaintiff has knowledge of "provable facts" that provide a "reasonable likelihood of ultimate success."[38]  "It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable

---

[34] *Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980) (collecting cases).

[35] *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1167 (Del. 1989).

[36] *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012) (citations omitted).

[37] *See* DOB at 18.

[38] *Chrysler Corp. v. Dann*, 223 A.2d 384, 387 (Del. 1966).

10

hope."[39]  Here, Plaintiff must demonstrate that a combined vote of both Class A and

Class B common stock on each of the Opt-Out Provision Amendment and the Share

Increase Amendment would have violated Section 242(b)(2).

Section 242(b)(2) follows.  I have numbered and broken out each sentence in

the subsection for clarity.  The first sentence requires a class vote on five types of

charter amendments affecting that class.

> [1] The holders of the outstanding shares of a class shall be entitled to
> vote as a class upon a proposed amendment, whether or not entitled to
> vote thereon by the certificate of incorporation, if the amendment would
> increase or decrease the aggregate number of authorized shares of such
> class, increase or decrease the par value of the shares of such class, or
> alter or change the powers, preferences, or special rights of the shares
> of such class so as to affect them adversely.[40]

The second sentence requires a series vote if any three of those charter amendments

uniquely affects a series.[41]  Its plain text does not require a series vote on an

---

[39] *Id.*

[40] 8 *Del. C.* § 242(b)(2).

[41] Contemporaneous legal commentary on Section 242's language, which was first added in the 1969 amendments to the Delaware General Corporation Law, clarifies that should one or more series be affected, all the affected stockholders vote together as an affected collective.  Ernest L. Folk, III, *Amendments to the Delaware Corporation Law* 14 (1969) ("Section 242 now specifically provides that if any proposed charter amendment would adversely affect the interest of one or more, but less than all, of the series within a class of stock, then the class vote required by section 242 to approve such adverse action applies only to the affected series rather than to the class as a whole.  It is obviously fair to the affected series to give it a special class vote rather than lump it with other series which have no interest in the proposed change."); S. Samuel Arsht & Walter K. Stapleton, *Analysis of the 1969 Amendments to the Delaware Corporation Law*, at 353–54 (Prentice Hall 1969) ("The prior statute, at least when read literally, required a class vote of the entire class on amendments which would adversely affect the powers, preferences and special

11

amendment increasing or decreasing the aggregate number of shares, or the par

value, of such series.

> [2] If any proposed amendment would alter or change the powers, preferences, or special rights of 1 or more series of any class so as to affect them adversely, but shall not so affect the entire class, then only the shares of the series so affected by the amendment shall be considered a separate class for the purposes of this paragraph.[42]

The third sentence permits a company to opt out of Section 242(b)(2)'s class voting

requirement for class share increases or decreases. If shares of that class have

already been issued and a charter amendment is required, a class vote is required.

> [3] The number of authorized shares of any such class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote irrespective of this subsection, if so provided in the original certificate of incorporation, in any amendment thereto which created such class or classes of stock or which was adopted prior to the issuance of any shares of such class or classes of stock, or in any amendment thereto which was authorized by a resolution or resolutions adopted by the affirmative vote of the holders of a majority of such class or classes of stock.[43]

---

rights of less than all series of the class. As amended, Section 242 provides that in such circumstances only the shares of the series adversely affected by the amendment shall be considered a class for the purpose of applying the class vote provision."). The 1969 amendments "chang[ed] the designation of [242] subsection (d) to subsection (c)." Ernest L. Folk, III, *Amendments to the Delaware Corporation Law* 23 (1969). "The 1983 revisions deleted 242(b) in its entirety and re-designated former section 242(c) as section 242(b)." 2 Robert S. Saunders et al., *Folk on the Delaware General Corporation Law*, § 242.08 at 8-39 (7th ed. 2022-2 Supp.). Accordingly, the commentary on the 1969 amendments discusses the current version of Section 242(b).

[42] 8 *Del. C.* § 242(b)(2).

[43] *Id.*

### i. The Demand Was Meritorious As To The Share Increase Amendment.

The parties' dispute over the Demand's merit centers on whether the Share Increase Amendment would have violated Section 242(b)(2) if voted on by the Class A and Class B stockholders together. The answer hinges on whether the Original Charter authorized Class A and Class B as two classes of common stock, or as series within a single class. The Share Increase Amendment vote as originally structured would have violated Section 242 only if Class A and Class B are separate classes of stock, rather than series. If Class A and Class B are separate classes, a vote by all common stockholders would have violated Section 242(b)(2)'s first sentence. If they are series, the Share Increase Amendment vote is governed by Section 242(b)(2)'s second sentence, which does not call for a series vote on an increase or decrease of the number of shares in that series.

Resolving these issues requires interpreting the Original Charter. Corporate charters are treated as contracts among the stockholders.[44] "Courts must give effect to the intent of the parties as revealed by the language of the certificate and the

---

[44] *See BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 977 (Del. 2020) (quoting *Hill Int'l, Inc. v. Opportunity P'rs L.P.*, 119 A.3d 30, 38 (Del. 2015), and citing *Centaur P'rs, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del. 1990)).

circumstances surrounding its creation and adoption."[45]  Delaware courts apply the general rules of contract interpretation to disputes over the meaning of charter provisions.[46]  Accordingly, Delaware courts interpret contract terms according to their plain, ordinary meaning,[47] and "attempt to give meaning and effect to each word in a contract, assuming that the parties would not include superfluous verbiage in their agreement."[48]  "When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity."[49]  Stock voting rights must "be specified expressly and with clarity."[50]  If charter provisions are unclear, Delaware courts "resolve any doubt in favor of the [common] stockholders' electoral rights."[51]

---

[45] *Waggoner v. Laster*, 581 A.2d 1127, 1134 (Del. 1990) (citing *Judah v. Del. Tr. Co.*, 378 A.2d 624, 628 (Del. 1977), and *Ellingwood v. Wolf's Head Oil Ref. Co.*, 38 A.2d 743, 747 (Del. 1944)).

[46] *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010).

[47] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[48] *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013) (citing *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007)).

[49] *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 57 (Del. 2019) (internal quotation marks omitted) (quoting *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014)).

[50] *Sullivan Money Mgmt., Inc. v. FLS Hldgs. Inc.*, 1992 WL 345453, at *3 n.7 (Del. Ch. Nov. 20, 1992) (citing 8 *Del. C.* § 151(a)), *aff'd*, 628 A.2d 84 (Del. 1993).

[51] *Airgas*, 8 A.3d at 1188 (citing *Centaur P'rs*, 582 A.2d at 927); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 38 (Del. Ch. 2013) ("By default, all stock is created equal.  Unless a corporation's certificate of incorporation provides otherwise, each share of stock is common stock."); *Sullivan*, 1992 WL 345453, at *3 ("Because rights or preferences over

Two sections of the Original Charter authorize the issuance of Company stock.

> Section 4.1 Authorized Capital Stock. The total number of shares of all classes of capital stock, each with a par value of $0.0001 per share, which the Corporation is authorized to issue is 401,000,000 shares, consisting of (a) 400,000,000 shares of common stock (the "Common Stock"), including (i) 380,000,000 shares of Class A common stock (the "Class A Common Stock"), and (ii) 20,000,000 shares of Class B common stock (the "Class B Common Stock"), and (b) 1,000,000 shares of preferred stock (the "Preferred Stock"). . . .[52]

> Section 4.2 Preferred Stock. Subject to Article IX of this Amended and Restated Certificate, the Board of Directors of the Corporation (the "Board") is hereby expressly authorized to provide out of the unissued shares of the Preferred Stock for one or more series of Preferred Stock and to establish from time to time the number of shares to be included in each such series and to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, of each such series and any qualifications, limitations and restrictions thereof, as shall be stated in the resolution or resolutions adopted by the Board providing for the issuance of such series and included in a certificate of designation (a "Preferred Stock Designation") filed pursuant to the DGCL, and the Board is hereby expressly vested with the authority to the full extent provided by law, now or hereafter, to adopt any such resolution or resolutions.[53]

---

common stock are in derogation of the common law, they 'should be clearly expressed and not presumed.'" (quoting *Warner Commc'ns Inc. v. Chris-Craft Indus.*, 583 A.2d 962, 967 (Del. Ch. 1989), *aff'd*, 567 A.2d 419 (Del. 1989), and citing *Waggoner*, 581 A.2d at 1134–35, and *Rothschild Int'l Corp. v. Liggett Grp. Inc.,* 474 A.2d 133, 136 (Del. 1984))); *id.* at *3 n.6 ("At common law, and in the absence of any statute or agreement to the contrary, all stock enjoys equal rights and privileges." (citing *Penington v. Commonwealth Hotel Constr. Corp.*, 155 A. 514, 520 (Del. 1931), and *Gaskill v. Gladys Belle Oil Co.*, 146 A. 337, 338 (Del. Ch. 1929))).

[52] Original Charter § 4.1 (bolding and italics omitted).

[53] *Id.* § 4.2 (bolding and italics omitted).

Section 4.3 governs "Common Stock" and its rights, but not its issuance.[54]

The parties comb through the Original Charter for references to "classes" and "series," and argue that the placement, presence, and absence of each supports their interpretation.[55] But none of these sections call the authorized Class A or Class B common stock a "series," nor do they refer to authorized "Common Stock" in "series."[56] Rather, Section 4.1 uses only the word "class," not the word "series," to describe the authorized common shares.

---

[54] *Id.* § 4.3.

[55] Defendant relies on the organization of Original Charter Section 4.1, which lists the Company's "classes of capital stock" as "(a) . . . common stock . . . including (i) . . . Class A common stock, . . . and (ii) . . . Class B common stock,. . . . and (b) preferred stock." DAB at 8–9 (citing Original Charter § 4.1). Defendant also points to two mentions of "series" of common stock in Section 4.3(a)(iii) as evidence that Class A is a "series," not a "class." Defendant broadly points to references in the Original Charter and Bylaws to "any vote of the holders of any class or series of capital stock." DOB at 18–19 (citing Original Charter at Article VII and the Company's original Bylaws at Sections 2.3, 2.6, 2.7(a)(ii), 3.2(d), and 9.15). Defendant miscited Original Charter Article VII but quoted Article VI. *See* PAB at 10–11. The parties did not file the Company's original Bylaws in this action, but they are attached to the Company's December 11, 2020 Form-1/A Registration Statement. Turk DOB Aff. at Ex. I, Seven Oaks Acquisition Corp., Registration Statement (Form S-1/A) (Dec. 11, 2020), at Ex. 3.3.

Plaintiff counters that the language in Original Charter Sections 4.3(a)(iii), 4.3(b)(ii), and 4.3(b)(iii) indicating that Class B holders alone can vote separately as "a single class" is evidence that Class A and Class B are "classes," not "series." PAB at 10. Defendant cited to the incorrect version of the Company Charter in its combined answering brief. Turk DOB Aff. at Ex. I, Seven Oaks Acquisition Corp., Registration Statement (Form S-1/A) (Dec. 11, 2020), at Ex. 3.1; PAB at 10 (pointing out that Defendant attached the incorrect Charter to its brief); DAB at n.2 (acknowledging that it attached the incorrect Charter to its combined answering brief).

[56] Section 4.3(a)(iii) describes the voting rights of "holders of shares of any series of Common Stock." Original Charter § 4.3(a)(iii). But Section 4.1 does not authorize the issuance of a series of common stock or grant the board the present power to fix series of

16

From there, I look to Sections 102 and 151 of the DGCL to illuminate the structure and significance of Sections 4.1 and 4.2.  The DGCL is part of the charter or certificate of incorporation of every Delaware corporation.[57]  The DGCL "regards 'classes' of stock as separate and distinct from 'series' within a class."[58]  DGCL Section 102(a)(4) prescribes what the charter must include for the corporation to issue classes or series of stock.  It provides, in pertinent part:

---

common stock by resolution.  *See* 8 *Del. C.* § 102(a)(4).  I, therefore, interpret Section 4.3(a)(iii) to be referring to a hypothetical series authorized in the future.

[57] 8 *Del. C.* § 394.

[58] *Siegman v. Palomar Med. Techs., Inc.*, 1998 WL 118201, at *4 (Del. Ch. Mar. 9, 1998); *see also e.g.*, 8 *Del. C.* § 151 ("Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof . . . ."); *id.* § 102(a)(4) ("The certificate of incorporation shall also set forth a statement of the designations and the powers, preferences and rights, and the qualifications, limitations or restrictions thereof, which are permitted by § 151 of this title in respect of *any class or classes of stock or any series of any class of stock of the corporation* . . . ." (emphasis added)); *id.* § 102(b)(3) ("any class or series of a class thereof"); *id.* § 102(b)(4) ("any class or series thereof"); 1 R. Franklin Balotti & Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 5.3 at 5-8–5-9 (3rd ed. Supp. 2021-2) [hereinafter "Balotti & Finkelstein"] ("The certificate of incorporation may authorize the corporation to issue one or more classes of stock and one or more series within each class."  (citing 8 *Del. C.* §§ 102(b)(4), 151)).

The common law has been less precise, and "[t]he jurisprudence of class votes in Delaware is not highly developed."  *Orban v. Field*, 1993 WL 547187, at *8 (Del. Ch. Dec. 30, 1993) (citing Drexler, Black & Sparks, *Delaware Corporation Law and Practice*, § 32.04 (1993)); *see also, e.g.*, *id.* at *2 (describing "three classes of equity" in Series A preferred, Series B preferred, and common); *Sullivan*, 1992 WL 345453, at *3 ("Section B.1(H)(iii), like the disputed certificate provisions in *Warner*, entitles the Series A Preferred Stock to a class vote . . . ."); *Matulich v. Aegis Commc'ns Grp, Inc.*, 2007 WL 1662667, at *1 (Del. Ch. May 31, 2007) ("By 2003, Aegis had issued several classes of stock:  Common Stock, Series B Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, and Series F Preferred Stock.").

17

If the corporation is to be authorized to issue more than 1 class of stock, the certificate of incorporation shall set forth the total number of shares of all classes of stock which the corporation shall have authority to issue and the number of shares of each class and shall specify each class the shares of which are to be without par value and each class the shares of which are to have par value and the par value of the shares of each such class. The certificate of incorporation shall also set forth a statement of the designations and the powers, preferences and rights, and the qualifications, limitations or restrictions thereof, which are permitted by § 151 of this title in respect of any class or classes of stock or any series of any class of stock of the corporation and the fixing of which by the certificate of incorporation is desired, and an express grant of such authority as it may then be desired to grant to the board of directors to fix by resolution or resolutions any thereof that may be desired but which shall not be fixed by the certificate of incorporation.[59]

In other words, "[i]f the corporation will have authority to issue more than one class of shares, then the certificate must set forth the number of shares of all classes and of each class and whether the shares are par or no-par."[60] No such preemptive recitation is required if only one class is authorized, or for series.[61] "[P]ar value must be the same for all series within a class."[62] The power to issue series of stock is

---

[59] 8 *Del. C.* § 102(a)(4).

[60] 1 Robert S. Saunders et al., *Folk on the Delaware General Corporation Law*, § 102.05 at 1-21 (7th ed. 2022-2 Supp.).

[61] Section 102(a)(4)'s more specific charter directives for the number and par value of shares in a class, which are not required for a series, are consistent with Section 242(b)'s more specific vote directives to change the number or par value of shares in a class, which are not required for a series.

[62] Balotti & Finkelstein § 5.3 at 5-9.

different and apart from the power to issue a class of stock, and the power to issue stock in classes does not grant the power to issue stock in series.[63]

All stock, including founding stock, must also be issued in accordance with DGCL Section 151.[64] Section 151(a) provides in pertinent part:

> *Every corporation may issue 1 or more classes of stock or 1 or more series of stock within any class thereof*, any or all of which classes may be of stock with par value or stock without par value and which classes or series may have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, *as shall be stated and expressed in the certificate of incorporation . . . .*[65]

Against these prescriptive requirements, I turn to the Original Charter. Section 4.1 lists the number of shares of Class A common stock, the number of shares of Class B common stock, and the number of shares of preferred stock, and describes the shares in each as having "a par value of $0.0001 per share."[66] Read with Section 102(a)(4)'s requirements for authorizing capital stock, Section 4.1's plain language is designed to authorize three statutorily compliant "classes," with a

---

[63] *Siegman*, 1998 WL 118201, at *4.

[64] *See, e.g.*, *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del. 1991) ("Stock issued in violation of 8 *Del. C.* § 151 is void and not merely voidable." (citing *Triplex Shoe Co. v. Rice & Hutchins*, 152 A. 342, 347 (Del. 1930), and Drexler, Black & Sparks, *Delaware Corporation Law and Practice*, § 17.02 at 17–23 n.89 (1990))).

[65] 8 *Del. C.* § 151(a) (emphasis added).

[66] Original Charter § 4.1; 8 *Del. C.* § 102(a)(4).

share count and par value that Section 102(a)(4) prescribes for classes but not for series. It does not fix or authorize the board to fix any series of common stock.

By contrast, Section 4.2, titled "Preferred Stock," vests the Board with authority to provide for "one or more series of Preferred Stock" and establish "the number of shares to be included in each such series" by resolution.[67] Section 4.2 complies with DGCL Section 102(a)(4)'s prescription for granting board authority to fix series by resolution. Neither Section 4.1 nor Section 4.3, titled "Common Stock," includes a similar provision: neither fixes or grants the Board authority to fix series of common stock.[68] "While that omission may have been accidental, given the requirements of Delaware law this Court cannot presume so and thereafter supply the missing provisions."[69]

Read as a whole and together with the DGCL, Sections 4.1 and 4.2 of the Original Charter granted the Company authority to issue classes of preferred stock and series of preferred stock, but only classes of common stock—not series. The Original Charter followed the DGCL's instructions for implementing that authorization. I conclude that Class A and Class B are each a class of common stock, not series.

---

[67] Original Charter § 4.2.

[68] *Id.* § 4.3; *see supra* note 56.

[69] *Waggoner*, 581 A.2d at 1135.

So concluding, I turn to what that means for Class A's statutory voting rights on the Share Increase Amendment. The Original Charter directed compliance with Section 242.[70] The first sentence of Section 242(b)(2) requires "[t]he holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment, . . . if the amendment would increase or decrease the aggregate number of authorized shares of such class."[71] The Share Increase Amendment proposed increasing the authorized shares of Class A common stock.[72] Accordingly, Section 242(b)(2) required a separate Class A vote on the Share Increase Amendment. The Demand was meritorious as to the Share Increase Amendment.

### ii. The Demand Was Meritorious As To The Opt-Out Provision Amendment.

I now turn to the Opt-Out Provision Amendment. Readers may recall it was designed to take advantage of Section 242(b)(2)'s third sentence and eliminate the Class A stockholders' right to a separate vote for future share increases in that class, in favor of a vote by the majority of all voting stock.[73] Readers may also recall the third sentence of Section 242(b)(2) requires such an amendment to be "authorized

---

[70] Original Charter § 4.3(a)(iii).

[71] 8 *Del. C.* § 242(b)(2). Because Section 242's second sentence does not bestow this voting right on series being increased or decreased, any lack of clarity in the Original Charter should be resolved in favor of the additional electoral rights afforded by concluding Class A and Class B are classes. *Supra* note 51 and accompanying text.

[72] *See supra* note 12.

[73] *See* Compl. ¶¶ 7, 25–26, 35–36.

by a resolution or resolutions adopted by the affirmative vote of the holders of a majority of such class or classes of stock."[74]

The Demand asserted the Company's attempt to obtain approval of the Opt-Out Provision Amendment through a combined vote of both Class A and Class B did not comply with Section 242(b)(2)'s requirement for a Class A vote.[75] Because Class A is a class rather than a series, Section 242(b)(2)'s third sentence required the majority of Class A common stockholders to approve the Opt-Out Provision Amendment.[76] The Class A common stockholders were not initially afforded this opportunity. The Demand was meritorious as to the Opt-Out Provision Amendment.

### 2. The Demand Conferred A Substantial Benefit.

Once a plaintiff brings a meritorious suit—or demand—the action must "specifically and substantially" benefit the corporation and its stockholders to warrant fees.[77] While the benefit "need not involve the recovery of property or

---

[74] 8 *Del. C.* § 242 (b)(2). Section 242(b)(2)'s other avenues to a simple majority vote were not available to the Company: the Original Charter did not provide for it, and the Company had already issued Class A common shares. *Id.*

[75] Demand at 10.

[76] 8 *Del. C.* § 242(b)(2) ("The number of authorized shares of any such class or classes of stock may be increased . . . by the affirmative vote of the holders of a majority of the stock of the corporation entitled to vote irrespective of this subsection, if so provided in . . . any amendment thereto which was authorized by a resolution or resolutions adopted by the affirmative vote of the holders of a majority of such class or classes of stock."); *see id.* requiring a class vote "if the amendment would . . . alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely").

[77] *Chrysler*, 223 A.2d at 386 (collecting authorities).

22

prevention of a dissipation of assets," its value must be "immediately discernible rather than speculative in character."[78]  Plaintiff bears the burden of establishing the value of any benefit conferred.[79]  Plaintiff has done so.

The Demand conferred a meaningful benefit on the Company and its stockholders by addressing the statutory problems with the proposed voting structure for the Challenged Amendments.[80]  "Delaware law recognizes that corporate benefits to achieve statutory compliance and to vindicate the stockholder franchise are some of the most important benefits that can be achieved through stockholder litigation."[81]  Delaware law also requires "scrupulous adherence to statutory formalities when a board takes actions change a corporation's capital structure,"[82]

---

[78] *Richman v. DeVal Aerodynamics, Inc.*, 185 A.2d 884, 885–86 (Del. Ch. 1962).

[79] *See In re Am. Real Estate P'rs, L.P.*, 1997 WL 770718, at *6 (Del. Ch. Dec. 3, 1997) (citing *In re Diamond Shamrock Corp.*, 1988 WL 94752, at *4 (Del. Ch. Sept. 14, 1988)).

[80] *E.g.*, *Olson v. ev3, Inc.*, 2011 WL 704409, at *11 (Del. Ch. Feb. 21, 2011); *Hawkes v. Bettino*, C.A. No. 2020-0360-PAF, at 103 (Del. Ch. Apr. 1, 2021) (TRANSCRIPT) (finding "no difficulty in recognizing the material benefit achieved" by curing statutory defects to stockholder votes).

Readers steeped in this Court's jurisprudence may stop short at this opinion's citation of transcript rulings as binding authority.  *Day v. Diligence, Inc.*, 2020 WL 2214377, at *1 (Del. Ch. May 7, 2020).  But by pattern, practice, and the demands on this Court, most decisions on fee awards are transcript rulings.  In this specific fee award dispute, in which both litigants are represented by counsel with access to a library of transcript rulings, I view transcript rulings as authority akin to an opinion.  *See Olson*, 2011 WL 704409, at *8.

[81] *Hawkes*, C.A. No. 2020-0360-PAF, at 103.

[82] *Blades v. Wisehart*, 2010 WL 4638603, at *8 (Del. Ch. Nov. 17, 2010), *superseded by statute on other grounds*, 8 *Del. C.* §§ 204, 205; *STAAR Surgical*, 588 A.2d at 1136 ("The Waggoners' attempt to trivialize the unassailable facts of this case as mere 'technicalities'

so it recognizes the material benefit of "allowing the company to easily and effectively cure a potentially serious defect in its capital structure."[83] The Court has also recognized that correcting a "class voting issue" may confer a greater benefit than correcting a voting error in a situation where all stockholders vote together, particularly where the majority's vote may be more or less a foregone conclusion.[84] The Demand conferred such a benefit on the Class A stockholders.

The separate vote on the Opt-Out Provision Amendment and Share Increase Amendment achieved statutory compliance and vindicated the stockholder franchise. The separate vote on the Share Increase Amendment also prevented a cloud from hanging over the Company's capital structure by ensuring "scrupulous adherence to statutory formalities," in connection with all future common stock issuances. [85] "Shareholder voting rights are sacrosanct" and "[p]reserving shareholder voting rights produces a fundamental corporate benefit."[86]

---

is wholly unpersuasive. The issuance of corporate stock is an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise. The law properly requires certainty in such matters.").

[83] *De Felice v. Kidron* ("*Oramed*"), C.A. No. 2021-0255-MTZ, at 16 (Del. Ch. Apr. 27, 2022) (TRANSCRIPT); *see also In re Cheniere Energy, Inc.*, C.A. No. 9710-VCL, at 104 (Del. Ch. Mar. 16, 2015) (TRANSCRIPT) (awarding $1 million for "correcting the capital structure").

[84] *See Berge v. Sequa*, C.A. No. 17101-VCL, at 27, 34–35, 54 (Del. Ch. Oct. 5, 1999) (TRANSCRIPT).

[85] *Blades*, 2010 WL 4638603, at *8.

[86] *EMAK*, 50 A.3d at 433.

24

And, had the Share Increase Amendment voting structure gone uncorrected, the new shares would have been invalidly issued.[87] Further, the Combination was conditioned on approval of the Proposed Charter; the merger itself would have been on shaky ground if those votes were not properly administered.[88] To the extent the Combination closed in reliance on the Challenged Amendments, "the validity of the Merger could be attacked. The invalidity of that transaction in turn could have called into question subsequent acts by the surviving corporation."[89] These are all material benefits. And preventive action is as beneficial as corrective action, if not more: diffusing a ticking time bomb can be more valuable than cleaning up shrapnel.

Defendant argues the Challenged Amendments did not create a conflict between Class A and Class B common stockholders, and so no benefit was achieved by separate votes. This qualitative argument disregards Section 242's plain statutory requirements; the statute leaves no room for noncompliance just because the separate votes might produce the same result as a majority vote. By taking the Company off a path that violated the DGCL and the stockholder franchise, Plaintiff conferred a substantial benefit.

---

[87] *Oramed*, C.A. No. 2021-0255-MTZ, at 17.

[88] Proxy at Notice of Special Meeting of Stockholders; Compl. ¶ 2.

[89] *Olson*, 2011 WL 704409, at *11.

**B.  Plaintiff Is Entitled To $850,000 In Attorneys' Fees And Expenses.**

Under Delaware law, Plaintiff's counsel is entitled to fees and expenses under the corporate benefit doctrine for the benefits it conferred on the nominal defendant. [90]  In setting fee awards, the Court of Chancery "must make an independent determination of reasonableness."[91]

When setting a fee award, the Court will generally follow the factors identified in the Delaware Supreme Court's *Sugarland* decision and relied on by subsequent decisions.[92]  The relevant factors here are:  (1) the benefit achieved; (2) the time and effort of counsel; (3) the standing and ability of counsel; (4) the relative complexities of the litigation; (5) the stage at which the litigation ended; and (6) any contingency factor;.[93]  Defendant does not dispute the seventh *Sugarland* factor:  whether the plaintiff can be credited for the benefit.

The factors are not weighted equally.  This Court has consistently noted that the most important factors in determining a fee award are the size of the benefit

---

[90] *Id.* at *8.

[91] *Goodrich v. E.P. Hutton Grp., Inc.*, 681 A.2d 1039, 1045–46 (Del. 1996).

[92] *See, e.g.*, *Sciabacucchi v. Salzberg*, 2019 WL 2913272, at *1 (Del. Ch. July 8, 2019) (quoting *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012)), *judgment entered*, 2019 WL 3502495 (Del. Ch. Aug. 1, 2019), *vacated on other grounds*, 2020 WL 1985048 (Del. Ch. Apr. 24, 2020).

[93] *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142 (Del. 1980).

achieved, and whether the plaintiff can be credited for the benefit.[94] Secondary factors include the complexity of the litigation, the standing and skill of counsel, the contingent nature of the fee arrangement and the level of contingency risk actually involved in the case.[95] "Precedent awards from similar cases may be considered for the obvious reason that like cases should be treated alike."[96] Applying the *Sugarland* factors here, I find that they weigh in support of an award between what the parties suggest. I address each factor in turn.

### 1. The Benefits Achieved

When considering the fee award, the Court looks at the size of benefit conferred on the company and its stockholders.[97] As explained, Plaintiff's Demand preserved the Class A common stockholders' statutory right to a separate vote on

---

[94] *E.g.*, *In re Plains Res. Inc.*, 2005 WL 332811, at *3 (Del. Ch. Feb. 4, 2005) ("The factors are: . . . (vi) whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof; and (vii) the size of the benefit conferred. The last two elements are often considered the most important." (citing *Sugarland*, 420 A.2d at 149–50)); *Gatz v. Ponsoldt*, 2009 WL 1743760, at *3 (Del. Ch. June 12, 2009) ("This Court has consistently noted that the most important factor in determining a fee award is the size of the benefit achieved."); *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018, at *8 (Del. Ch. Aug. 30, 2007) ("In determining the size of an award of attorney's fees, courts assign the greatest weight to the benefit achieved by the litigation." (citing *Sugarland*, 420 A.2d at 150)).

[95] *Olson*, 2011 WL 704409, at *8 (citing *Gatz*, 2009 WL 1743760, at *3).

[96] *Id.*

[97] *E.g.*, *Gatz*, 2009 WL 1743760, at *3.

the Challenged Amendments. That preservation also enhanced the certainty of the Company's capital structure and the Business Transaction.

Precedent supports awarding such benefits with a substantial fee.[98] In *Olson v. ev3, Inc.*, the Court awarded the plaintiff's counsel $1.1 million in fees and expenses for remedying statutory problems with the company's top-up option.[99] The Court emphasized a seven-figure award was "fair and reasonable compensation for a settlement that cured serious statutory flaws."[100] In *In re Psychiatric Solutions, Inc. Shareholder Litigation*, the Court awarded the plaintiff's counsel a "modest" $800,000 in fees and $200,000 in expenses for challenging stock option awards to the company's executives, which secured a revote on the stock options and additional disclosures to support them.[101] In *In re Cheniere Energy, Inc.*, the Court awarded the plaintiff's counsel $1,000,000 for "correcting the capital structure," and $2.5 million for securing a stockholder revote based on the correct voting standard after challenging the issuance of incentive compensation awards, alleging the

---

[98] If the Original Charter were ambiguous on whether Class A was a class deserving of a separate vote, that ambiguity would have favored an interpretation anointing Class A as a class. *See supra*, note 51 and accompanying text. And this Court has not discounted awards in response to possibly ambiguous benefits, instead rewarding certainty. *See Oramed*, C.A. No. 2021-0255-MTZ, at 23.

[99] 2011 WL 704409, at *1, *14–16.

[100] *Id.* at *15.

[101] *In re Psychiatric Sols., Inc. S'holder Litig.*, C.A. No. 5514-VCG, at 24–28 (Del. Ch. Sept. 6, 2011) (TRANSCRIPT).

stockholder vote that approved them was inconsistent with the voting standards outlined in the company's bylaws.[102] Earlier this year, in *De Felice v. Kidron* ("*Oramed*"), I awarded the plaintiff's counsel $850,000 for providing stockholders an opportunity to reject or ratify two years' worth of incentive plans and a director election that were built on "allegedly flawed votes"; requiring the company to amend its bylaws to conform with its public statements; and requiring the company to adopt corporate governance enhancements to protect the shareholder franchise.[103] These cases support an award in the range of $850,000 to $3.5 million where the plaintiff finds and disables a corporate landmine, particularly one that deals with the shareholder franchise or the company's capitalization, without regard to hours worked.

Defendant primarily relies on *Berge v. Sequa Corporation* to argue the benefits Plaintiff conferred merit only a nominal award.[104] The Court awarded the *Sequa* plaintiff $100,000.[105] *Sequa* is distinguishable for at least two reasons. The plaintiff in *Sequa* brought litigation to correct a violation of Section 242(b) in connection with a proposed charter amendment that was not in conjunction with a

---

[102] *Cheniere*, C.A. No. 9710-VCL, at 91–95, 102, 104.

[103] *Oramed*, C.A. No. 2021-0255-MTZ, at 12, 15–16.

[104] DOB at 35–37, 44–45, 53, 56; DAB at 15–19; *e.g.*, Hr'g Tr. 47–52.

[105] *Sequa*, C.A. No. 17101-VCL, at 62.

stock issuance or pending transaction.[106] Here, the Section 242(b) violation was in connection with a pending merger conditioned on stockholder approval of the Challenged Amendments.[107] If the statutory violation went uncorrected, it would have been more difficult to unwind the Combination than the vote at issue in *Sequa*.

Relatedly, the Section 242 violation in *Sequa* was more akin to a disclosure violation. The proxy misstated the number of votes required to amend the charter: "the vote required was a majority vote of all the shares entitled to vote on the matter, not simply a majority of those voting."[108] In considering the size of the benefit conferred, Vice Chancellor Lamb described the problem as a mistaken disclosure, and not "a case of any intentional deprivation of voting rights."[109] The Court focused on whether the corrected problem "was just a mistake or not because it . . . [bore] on the nature of the benefit obtained."[110] Defendant presses this Court to follow *Sequa* and treat the benefit here as a disclosure settlement. But as explained, Plaintiff contributed a statutory fix with broader implications.[111]

---

[106] *Id.* at 25–26.

[107] Proxy at Notice of Special Meeting of Stockholders; Compl. ¶ 2.

[108] *Sequa*, C.A. No. 17101-VCL, at 56.

[109] *Id.* at 53; *see also id.* at 27 ("The 242(b) issue simply was missed. . . . It was simply overlooked. As soon as it was brought to our attention by the filing of the complaint and the injunctive papers, we promptly corrected it.").

[110] *Id.* at 55–56.

[111] *See Olson*, 2011 WL 704409, at *8, *16 ("The defendants' figure [$525,000] under-prices what the plaintiffs achieved. It would be appropriate for a routine disclosure-only

Defendant also argues that as in *Sequa*, "[t]here is zero evidence that failing to provide separate class voting for Class A shares was anything but an oversight."[112] If the Challenged Amendments were oversights, they are of much greater magnitude and consequence. The Challenged Amendments were intentionally drafted to take advantage of the third sentence of Section 242(b) and permit the Company to issue Class A stock without a separate Class A vote.[113] The Company then structured the votes so that Class A was not afforded a separate vote on the Challenged Amendments. This was not a misstatement of disclosing what vote totals were required, but rather a structural omission. Plaintiff here conferred a more significant benefit than the plaintiff in *Sequa*.

Plaintiff seeks $2,000,000 in attorneys' fees.[114] Plaintiff's counsel has filed several similar cases against other SPACs with the same charter language and proposed votes, in which he sent the same demand and procured the same benefit— but seeks a far lower fee award.[115] At argument, Plaintiff's counsel conceded the

---

settlement, not a case where the plaintiff obtained full relief and remedied potential statutory violations.").

[112] DAB at 17.

[113] *Supra* note 12.

[114] POB at 4, 21, 24, 36, 47.

[115] *Umbright v. Khosla Ventures Acq. Co. II* ("*Nextdoor*"), C.A. No. 2021-0762-LWW (Del. Ch. Mar. 14, 2022), D.I. 18 (seeking $1.25 million in fees); *Franchi v. dMY Tech. Grp., Inc. IV*, 2021-0841-KSJM (Del. Ch. Oct. 20, 2022), D.I. 7 (seeking $950,000 in fees and expenses); *Franchi v. CM Life Scis. III Inc.*, 2021-0842-KSJM (Del. Ch. Oct. 20, 2022), D.I. 10 (same). Several other identical but unrelated actions are now

31

additional fees sought from Defendant are not tied to the corporate benefit it

received.[116] While I appreciate counsel's candor and believe these types of matters

dismissed or mooted. Hr'g Tr. 24, 63; *Bass v. Mudrick Cap. Acq. Co.*, No. 2021-0690-LWW (Del. Ch.); *Delman v. Fusion Acq. Corp.*, No. 2021-0752-JRS (Del. Ch.); *Solak v. Redbox Ent., Inc.*, No. 2022-0099-LWW (Del. Ch.); *Elstein v. Hagerty, Inc.*, C.A. No. 2022-0214-LWW (Del. Ch.); *Drulias v. Pardes Biosciences, Inc.*, No. 2022-0432-LWW (Del. Ch.).

[116] Counsel pursued a premium fee award in this case specifically because, in counsel's view, my decision in *Oramed* created a "change in circumstances." Hr'g Tr. 27–29. Counsel explained the machinations that went into presenting and maintaining this action as the first to set a fee award. *Nextdoor*, which seeks $1.25 million, "was initially the first case that was scheduled to be argued." *Id.* 27–28; *Nextdoor*, C.A. No. 2021-0762-LWW (Del. Ch. June 10, 2022), D.I. 25 (scheduling a hearing for September 7, 2022). "The order was going to be [*Nextdoor*]; this case, *Boxed*; and [*Elstein v.*] *Hagerty*." Hr'g Tr. 28. But between the time [*Nextdoor*] and *Boxed* were filed, "the *Oramed* case came down." *Id.* Counsel explained, "And given that change in circumstances . . . . I can say, from our perspective, it increased the value of this case. . . . We thought, based on *Oramed*, the value was increased, and we brought it up to [$]2 million." *Id.* "The [*Nextdoor*] argument date got pushed . . . [to] January of next year*." Id.* With that change, when *Boxed* was argued, "*Hagerty* [was] the next one in line. It [was] due to be argued Friday. We did not demand [$]2 million there because *Boxed* went first*." Id.* The day after I took this matter under advisement, and the day before argument in *Hagerty*, Plaintiff's counsel filed, and the Court granted, a stipulated dismissal of that case with prejudice. *Hagerty*, C.A. No. 2022-0214-LWW (Del. Ch. Oct. 20, 2022), D.I. 22 and D.I. 23. That same day, Plaintiff's counsel also filed its fee petitions for $950,000 in both *Franchi v. dMY Tech. Group, Inc. IV*, and *Franchi v. CM Life Sciences III Inc. Supra* note 115. I have used *Oramed* as a yardstick for a comparable statutory fix and see nothing in it that supports a premium in *Boxed* over other comparable cases.

Plaintiff's counsel also offered that this action carried the weight of more "underlying work" that benefitted the similar but unrelated actions where either less work was necessary or where counsel did not get paid. Hr'g Tr. 28–29. This metric does little work for a fee award based on the corporate benefit doctrine. *In re Duke Energy Corp. Deriv. Litig.*, 2017 WL 5256305, at *2 (Del. Ch. Nov. 13, 2017) ("It is not the extent of that effort, of course, that must be compensated, but rather the effect of that effort on the creation of the common benefit *here*." (emphasis added) (citing *Ams. Mining*, 51 A.3d at 1255)). The award in this action surely compensates counsel for the 42.75 hours of work performed. D.I. 17, Affidavit of Steven J. Purcell in Support of Plaintiff's Motion for

warrant full and incentivizing compensation, the most important factor in awarding a fee is the benefit conferred to the defendant company.[117] The corporate benefit doctrine arises from the principle that a plaintiff is entitled to reimbursement through contribution from all of those who benefitted.[118] The Court's job is to determine reasonableness "on behalf of the beneficiaries of the common benefit."[119] The sequence in which fee petitions are heard has no relation to the benefit each defendant obtained. With corporate benefit as my north star, and cognizant of pattern and practice before this Court, I see no principled reason to saddle the unlucky first company to have its fee award set by the Court with fees that exceed the benefit that company received.[120] It is yet to be determined whether Plaintiff's counsel's other actions conferred the same or similar benefits on their respective companies for allegedly correcting the same statutory violation will garner the same award. [121] Published precedent counsels against awarding a lower award in

Summary Judgment and Application for an Award of Attorneys' Fees and Expenses ¶ 4 [hereinafter "Purcell Aff."].

[117] *Supra* note 94.

[118] 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 17.03[f][1], at 17-22 (2021).

[119] *Id.* § 17.03[f][3], at 17-28.

[120] *Cf. Sequa*, C.A. No. 17101-VCL, at 58 ("I think it would be wrong not to give it some consideration, because I mean after all, we are talking about the corporation's money, and making an award that adequately and fully compensates counsel, but at the same time not an award that is a penalty of some sort to the corporation.").

[121] *Supra* note 115.

subsequent, presumably more efficient actions built on the arguments in this first case.[122] In my view, if the corporate benefit doctrine is faithfully followed, and if Plaintiff's counsel's other actions conferred the same benefit for the same statutory fix and the rest of the *Sugarland* factors are the same, counsel should receive the same award regardless of the order the fee awards are filed, briefed, or taken under advisement.[123] Those plaintiffs did not confer a benefit on this Company or its stockholders, and so the existence of other actions for which a fee has not yet been awarded does not warrant a premium in the first-heard matter.

### 2. The Secondary *Sugarland* Factors

"Secondary factors include the complexity of the litigation, the standing and skill of counsel, and the contingent nature of the fee arrangement together with the

---

[122] *Duke Energy*, 2017 WL 5256305, at *2 ("It is not the extent of that effort, of course, that must be compensated, but rather the effect of that effort on the creation of the common benefit *here*." (emphasis added)); *Sciabacucchi*, 2019 WL 2913272, at *7 ("The relatively low number of hours that plaintiff's counsel incurred in this case also fails to reflect the overall value of counsel's investment, because they first developed the arguments that prevailed in this case during the course of other litigation."); *Seinfeld v. Coker*, 847 A.2d 330, 333 (Del. Ch. 2000) (emphasizing the importance of incentivizing efficient litigation and settlement, and litigation that induces monitoring behavior, while avoiding windfalls); *Goodrich*, 681 A.2d at 1044 (seeking to avoid unjustly enriched beneficiaries who obtain the benefit of a lawsuit without contributing (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980), and *Tandycrafts*, 562 A.2d at 1166)). Indeed, in this matter where counsel spent only 42.75 hours to accomplish the benefits conferred, it is difficult to imagine a meaningfully smaller number of hours would be needed in successive actions. Purcell Aff. ¶ 4.

[123] *See supra* note 96 and accompanying text.

level of contingency risk actually involved in the case."[124] "All else equal, litigation that is challenging and complex supports a higher fee award."[125] Plaintiff asserts his fee award should be augmented by the novel fact that the Company was a SPAC. But the issues were born from the interpretation of a charter, something every Delaware corporation has. Plaintiff's flight of suits is distinguishable from a situation in which counsel seeks a favorable ruling on a novel question before bringing a multiplicity of suits. In my view, the fact that Plaintiff's counsel has identified a recurring fact pattern does not support the arbitrary anointment of the first case to be decided as "novel" and therefore worth a premium, particularly when all the cases were brought around the same time. Nevertheless, while this litigation was not very challenging or complex, it was not as "straightforward" as the *Sequa* litigation given the need to construe the Original Charter.[126] The degree of complexity posed by the litigation supports the reasonableness of the award, but does not call for a premium.

---

[124] *Judy v. Preferred Commc'n Sys., Inc.*, 2016 WL 4992687, at *15 (Del. Ch. Sept. 19, 2016) (citing *Gatz*, 2009 WL 1743760, at *3).

[125] *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1072 (Del. Ch. 2015).

[126] *See Sequa*, C.A. No. 17101-VCL, at 56.

"Law firms establish a track record over time, and they 'build (and sometimes burn) reputational capital.'"[127]  Plaintiff's counsel is well known to the Court.  Their skill and experience support the award.  This factor does not warrant either an upward or downward departure.[128]

Counsel may be "entitled to a much larger fee when the compensation is contingent than when it is fixed on an hourly or contractual basis."[129]  "Fee awards should encourage future meritorious lawsuits by compensating the plaintiffs' attorneys for their lost opportunity cost (typically their hourly rate), the risks associated with the litigation, and a premium."[130]  "But just because a lawyer works on contingency does not automatically warrant a significant award.  'Not all contingent cases involve the same level of contingency risk.'"[131]  While Plaintiff's

---

[127] *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *9 (Del. Ch. Dec. 31, 2010) (quoting *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 956 (Del. Ch. 2010)).

[128] *Sciabacucchi*, 2019 WL 2913272, at *8.

[129] *Ryan v. Gifford*, 2009 WL 18143, at *13 (Del. Ch. Jan. 2, 2009).

[130] *Franklin Balance Sheet*, 2007 WL 2495018, at *12 (citing *Seinfeld*, 847 A.2d at 333–34).

[131] *Sciabacucchi*, 2019 WL 2913272, at *7 (quoting *Activision*, 124 A.3d at 1073); *accord Berger v. Pubco Corp.*, 2008 WL 4173860, at *2 (Del. Ch. Sept. 8, 2008) ("Seeing the claim through to judgment lends weight to a higher award, both because of the greater risk inherent in litigation compared to settlement and because of the greater legal work required to obtain the judgment."); *but see Olson*, 2011 WL 704409, at *15 ("Counsel achieved via settlement all of the relief that they could have obtained by litigating through a merits hearing. Counsel should not be penalized for achieving complete victory quickly."); *Hawkes*, C.A. No. 2020-0360-PAF, at 105 ("Nevertheless, as this Court has observed, plaintiff's counsel should not be punished for achieving early and complete victory.  I

36

counsel took this case on a contingent basis, they did not undertake much risk. Plaintiff's counsel sent a single Demand letter pointing out statutory violations that were promptly addressed. Plaintiff did not initiate litigation until after the benefit was conferred. Cases that are "relatively safe in terms of forcing a settlement" do not face significant contingency risk.[132] Consequently, no premium is warranted based on the contingency risk or stage at which the litigation ended.

### 3. Counsel's Time And Effort

The time and effort expended by counsel is another secondary, or even tertiary, consideration to the benefits achieved.[133] Delaware courts regard this consideration as a crosscheck to guard against windfall awards,[134] "because the real measure of a fee award lies in the results achieved."[135] "This factor has two separate but related components: (i) time and (ii) effort."[136]

---

therefore do not take into account the stage at which the plaintiff's Section 203 claim was mooted."); *Sciabacucchi*, 2019 WL 2913272, at *7 ("Although the plaintiff prevailed at a relatively early stage of the case, and accordingly incurred a relatively small number of hours to date, I do not believe that this factor warrants reducing the precedent-based award.").

[132] *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1140 (Del. Ch. 2011).

[133] *E.g.*, *Pontiac Gen. Empls. Ret. Sys. v. Ballantine*, C.A. No. 9789-VCL, at 40 (Del. Ch. May 8, 2015) (TRANSCRIPT); *Sciabacucchi*, 2019 WL 2913272, at *6.

[134] *Olson*, 2011 WL 704409, at *8 (citing *Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC*, 986 A.2d 370, 396 (Del. Ch. 2010)).

[135] *Sciabacucchi*, 2019 WL 2913272, at *6.

[136] *Id.* (internal quotation marks omitted) (quoting *Sauer-Danfoss*, 65 A.3d at 1138).

Defendant argues the Court should adopt the lodestar method to measure counsel's time and effort and cut the requested fee accordingly. Courts have repeatedly acknowledged the shortcomings of the lodestar method, which include incentives to inflate attorney hours or billing rates.[137] Accordingly, Delaware courts should first look to precedents on which to base a fee award, which I have done.[138] I give no weight to the hours expended.[139]

### III. CONCLUSION

For the foregoing reasons, Plaintiff's counsel is awarded fees and expenses of $850,000. Defendant's Motion for Summary Judgment is **DENIED**. Plaintiff's Motion for Summary Judgment is **GRANTED IN PART**, and **DENIED IN PART** as to the amount of fees.

---

[137] *E.g.*, *id.* (quoting *Sauer-Danfoss*, 65 A.3d at 1138).

[138] *Id.*

[139] *E.g.*, *Olson*, 2011 WL 704409, at *15; *see also Ams. Mining*, 51 A.3d at 1257 ("*Sugarland* does not require, as the Defendants argue, courts to use the hourly rate implied by a percentage fee award, rather than the benefit conferred, as the benchmark for determining a reasonable fee award. To the contrary, in *Sugarland*, this Court refused to adopt the Third Circuit's lodestar approach, which primarily focuses on the time spent.").